PETERS *v.* HOBBY ET AL.

No. 376. Argued April 19, 1955.—Decided June 6, 1955.

*Thurman Arnold* and *Paul A. Porter* argued the cause for petitioner. With them on the brief were *Abe Fortas* and *Milton V. Freeman.*

*Assistant Attorney General Burger* argued the cause for respondents. With him on the brief were *Attorney General Brownell, Assistant Attorney General Tompkins, Assistant Attorney General Rankin, Samuel D. Slade* and *Benjamin Forman.*

Briefs of *amici curiae* urging reversal were filed by *Joseph A. Fanelli* and *Leo F. Lightner* for the Engineers and Scientists of America; *Herbert Monte Levy* and *Morris L. Ernst* for the American Civil Liberties Union; and *Arthur J. Goldberg, Thomas E. Harris* and *Joseph L. Rauh, Jr.* for the Congress of Industrial Organizations.

Mr. Chief Justice Warren delivered the opinion of the Court.

This action was instituted by petitioner in the District Court for the District of Columbia. The principal relief sought is a declaration that petitioner's removal and debarment from federal employment were invalid. Prior to trial, the District Court granted the respondents' motion for judgment on the pleadings. The judgment was affirmed, one judge dissenting, by the Court of Appeals for the District of Columbia Circuit, relying on its decision in *Bailey* v. *Richardson,* 86 U. S. App. D. C. 248, 182 F. 2d 46, sustained here by an equally divided vote, 341 U. S. 918. We granted certiorari, 348 U. S. 882, because the case appeared to present the same constitutional question left unresolved by this Court's action in *Bailey* v. *Richardson, supra.*

## I.

The basic facts are undisputed. Petitioner is a professor of medicine, specializing in the study of metabolism, at Yale University. For several years prior to 1953, because of his eminence in the field of medical science, he was employed as a Special Consultant in the United States Public Health Service of the Federal Security Agency. On April 10, 1953, the functions of the Federal Security Agency were transferred to the Department of Health, Education, and Welfare, headed by respondent Hobby. Petitioner's duties required his presence in Washington from four to ten days each year, when called upon by the Surgeon General, to render advice concerning proposals to grant federal assistance to various medical research institutions. This work was not of a confidential or sensitive character and did not entail access to classified material. Petitioner was compensated at a specified per diem rate for days actually worked.

At the time of his removal, petitioner was employed under an appointment expiring on December 31, 1953.

On March 21, 1947, Executive Order 9835 was issued by the President.[1] It provided that the head of each department and agency in the Executive Branch of the Government "shall be personally responsible for an effective program to assure that disloyal civilian officers or employees are not retained in employment in his department or agency." Toward that end, the Order directed the establishment within each department or agency of one or more loyalty boards "for the purpose of hearing loyalty cases arising within such department or agency and making recommendations with respect to the removal of any officer or employee . . . on grounds relating to loyalty . . . ." The order also provided for the establishment of a central Loyalty Review Board in the Civil Service Commission. The Board, in addition to various supervisory functions, was authorized "to review cases involving persons recommended for dismissal . . . by the loyalty board of any department or agency . . . ." The standard for removal prescribed by the Order was whether, "on all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States." This standard was amended on April 28, 1951.[2] As amended, the standard to be applied was whether, "on all the evidence, there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States."

In January 1949, Joseph E. McElvain, Chairman of the Board of Inquiry on Employee Loyalty of the Federal Security Agency, notified petitioner that derogatory information relating to his loyalty had been received. Accompanying McElvain's letter was a detailed inter-

[1] 12 Fed. Reg. 1935.
[2] Executive Order 10241, 16 Fed. Reg. 3690.

rogatory relating to petitioner's associations and affiliations. Petitioner promptly completed the form and returned it. Shortly thereafter, McElvain advised petitioner that the Agency Board had determined that no reasonable grounds existed for belief that petitioner was disloyal.

In May 1951, following the amendment of the removal standard prescribed by Executive Order 9835, the Executive Secretary of the Loyalty Review Board advised McElvain that petitioner's case should be reopened and readjudicated pursuant to the amended standard. Three months later, the Acting Chairman of the Loyalty Review Board informed McElvain that a panel of the Loyalty Review Board had considered petitioner's case and had recommended that it be remanded to the Agency Board for a hearing. Acting on the Loyalty Review Board's recommendation, McElvain sent petitioner a letter of charges. Sixteen charges were specified, relating to alleged membership in the Communist Party, sponsorship of certain petitions, affiliation with various organizations, and alleged association with Communists and Communist sympathizers. In his reply, made under oath, petitioner denied that he had ever been a member of the Communist Party and set forth information concerning the other charges.

On April 1 and 2, 1952, the Agency Board conducted a hearing on petitioner's case in New Haven, Connecticut. The sources of the information as to the facts bearing on the charges were not identified or made available to petitioner's counsel for cross-examination. The identity of one or more of the informants furnishing such information, but not of all the informants, was known to the Board. The only evidence adduced at the hearing was presented by petitioner. He testified under oath that he had never been a member of the Communist Party and also testified concerning the other charges against him. He did not

refuse to answer any question directed to him. Petitioner's testimony was supported by the testimony of eighteen other witnesses and the affidavits and statements of some forty additional persons. On May 23, 1952, McElvain notified petitioner that the Agency Board had determined that, on all the evidence, there was no reasonable doubt as to petitioner's loyalty.

Thereafter, on April 6, 1953, petitioner was advised by the Loyalty Review Board that it had determined to conduct a "post-audit" of the Agency Board's determination and, to this end, "hold a hearing and reach its own decision." [3] The hearing was held on May 12, 1953, in New Haven, before a panel of the Board consisting of respondents Hessey, Amen, and King. Once again, as at the previous hearing, the only evidence adduced was presented by petitioner. In his own testimony, petitioner denied membership in the Communist Party, discussed his political beliefs and his motives for engaging in the activities and associations which were the subject of the charges, and answered all questions put to him by the Board. In support of petitioner's testimony, five witnesses stated their long acquaintance with petitioner and their firm conviction of petitioner's loyalty.[4] In addition to this evidence, the record before the Board contained information supplied by informants whose identity was not disclosed to petitioner. The identity of one or more, but not all, of these informants was known to the Board. The information given by such informants had not been given under oath. The record also contained the evidence adduced by petitioner at the previous hearing. On this record, the Board determined that "on all the

---

[3] Authority for such action was purportedly based on Regulation 14 of the regulations of the Loyalty Review Board. 17 Fed. Reg. 631.

[4] Three of the five—a former President of Yale University, a former dean of the Yale Medical School, and a federal circuit judge—had given similar testimony at the previous hearing.

evidence, there is a reasonable doubt as to Dr. Peters' loyalty to the Government of the United States."

By letter of May 22, 1953, the Chairman of the Board advised petitioner of the Board's finding. The letter further stated that respondent Hobby had been notified of the decision and that petitioner had "been barred from the Federal service for a period of three years from May 18, 1953, and any and all pending applications or existing eligibilities are cancelled." The order of debarment was made by the Board on behalf of the Civil Service Commission, composed of respondents Young, Moore, and Lawton.[5] Following his removal and after an unsuccessful attempt to obtain a rehearing, petitioner brought the instant suit, naming each of the respondents as a defendant.

## II.

In his complaint, petitioner contends that the action taken against him was "in violation of Executive Order 9835 and the Constitution of the United States . . . ." In support of his contention that the action violated the Executive Order, he makes the allegation, among others, that the Loyalty Review Board "exercised power beyond its power 'to make advisory recommendations . . . to the head of the . . . agency', as defined by Executive Order 9835, Part III, § 1a . . . ." On the constitutional level, petitioner complains chiefly of the denial of any opportunity to confront and cross-examine his secret accusers. He alleges that his removal and debarment deprived him "of liberty and property without due process of law in that they branded him as a person disloyal to his country, arbitrarily, without basis in fact, and without a fair procedure and hearing." In addition, he alleges that "The imposition of the penalty of ineligibility for government service

---

[5] Authority for the order of debarment was purportedly based on Civil Service Rule V, § 5.101 (a), 5 CFR (1954 Supp.) § 5.101 (a).

constituted a violation of the prohibition against bills of attainder and *ex post facto* laws by punishing the plaintiff by declaring him ineligible to serve the Government without a judicial trial or a fair administrative hearing . . . ." Finally, petitioner alleges that his removal and debarment, solely on the basis of his political opinions, violated his right to freedom of speech.

In this Court, petitioner urges us to decide the case on the constitutional issues. These issues, if reached by the Court, would obviously present serious and far-reaching problems in reconciling fundamental constitutional guarantees with the procedures used to determine the loyalty of government personnel. Compare *Wieman* v. *Updegraff,* 344 U. S. 183; *United States* v. *Lovett,* 328 U. S. 303; *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123. And note this Court's division in *Bailey* v. *Richardson, supra.* We find, however, that the case can be decided without reaching the constitutional issues.

From a very early date, this Court has declined to anticipate a question of constitutional law in advance of the necessity of deciding it. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 553. See *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129, 136. Applying this rule to the instant case, we must at the outset determine whether petitioner's removal and debarment were effected in accord with Executive Order 9835. On consideration of this question, we conclude that the Loyalty Review Board's action was so patently in violation of the Executive Order—in fact, beyond the Board's delegated jurisdiction under the Order—that the constitutionality of the Order itself does not come into issue.[6]

---

[6] The question of the Board's jurisdiction was, on request of the Court, argued and briefed. Compare *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129, 132.

### III.

The power of the Loyalty Review Board to adjudicate individual cases is set forth specifically in § 1a of Part III of the Order:

> "The Board shall have authority to review cases involving persons recommended for dismissal on grounds relating to loyalty by the loyalty board of any department or agency and to make advisory recommendations thereon to the head of the employing department or agency. Such cases may be referred to the Board either by the employing department or agency, or by the officer or employee concerned."

Similarly, § 3 of Part II, which prescribes the procedures to be followed in loyalty cases under the Order, provides:

> "A recommendation of removal by a loyalty board shall be subject to appeal by the officer or employee affected, prior to his removal, to the head of the employing department or agency . . . and the decision of the department or agency concerned shall be subject to appeal to the Civil Service Commission's Loyalty Review Board, hereinafter provided for, for an advisory recommendation."

The authority thus conferred on the Loyalty Review Board was limited to "cases involving persons recommended for dismissal on grounds relating to loyalty by the loyalty board of any department or agency . . . ." And, even as to these cases, the Loyalty Review Board was denied any power to undertake review on its own motion; only the employee recommended for dismissal, or his department or agency, could refer such a case to the Loyalty Review Board.

In petitioner's case, the Board failed to respect either of these limitations. Petitioner had been twice cleared by the Agency Board and hence did not fall in the category of "persons recommended for dismissal on grounds relating to loyalty by the loyalty board of any department or agency." Moreover, petitioner's case was never referred to the Loyalty Review Board by petitioner or the Agency. Instead, the Loyalty Review Board, acting solely on its own motion, undertook to "hold a hearing and reach its own decision." On both grounds, the Board's action was plainly beyond its jurisdiction unless such action was authorized by some other provision in the Order.

Section 1 of Part III also provides:

> "b. The Board shall make rules and regulations, not inconsistent with the provisions of this order, deemed necessary to implement statutes and Executive orders relating to employee loyalty.
>
> "c. The Loyalty Review Board shall also:
>
> "(1) Advise all departments and agencies on all problems relating to employee loyalty.
>
> "(2) Disseminate information pertinent to employee loyalty programs.
>
> "(3) Coordinate the employee loyalty policies and procedures of the several departments and agencies.
>
> "(4) Make reports and submit recommendations to the Civil Service Commission for transmission to the President from time to time as may be necessary to the maintenance of the employee loyalty program."

Acting under subsection (b), the Board promulgated detailed regulations, effective December 14, 1947, elaborating its powers under the Order.[7] The regulations

---

[7] 13 Fed. Reg. 253 *et seq.*

distinguished between two types of proceedings in individual cases. The first dealt with appeals from adverse decisions.[8] The second, described in Regulation 14, claimed for the Board a very different function.[9] As amended on January 22, 1952, Regulation 14 provided:[10]

> *"Post-audit and review of files.* (a) The Board, or an executive committee of the Board, shall, as deemed necessary from time to time, cause post-audits to be made of the files on loyalty cases decided by the employing department or agency, or by a regional loyalty board.
>
> "(b) The Board or an executive committee of the Board, or a duly constituted panel of the Board, shall have the right, in its discretion to call up for review any case decided by any department or agency loyalty board or regional loyalty board, or by any head of an employing department or agency, even though no appeal has been taken. Any such review shall be made by a panel of the Board, and the panel, whether or not a hearing has been held in the case, may affirm the procedural method followed and the action taken, or remand the case with appropriate instructions to the agency or regional loyalty board concerned for hearing or for such further action or procedure as the panel may determine.
>
> "(c) If a panel reviews a record on post-audit and reaches the conclusion that the determination made below does not fully recognize that it is of 'vital importance' as set forth in Executive Order 9835 'that persons employed in the Federal service be

---

[8] *Id.,* at 255, 5 CFR § 210.9.

[9] 13 Fed. Reg. 255.

[10] 17 Fed. Reg. 631. Regulation 14 had previously been amended on December 17, 1948. 13 Fed. Reg. 9366, 5 CFR § 210.14.

of complete and unswerving loyalty to the United States,' then the panel may call up the case for a hearing, and after such hearing may affirm or reverse the original determination or decision. Nevertheless, it must always be remembered that while it is important that maximum protection be afforded the United States against infiltration of disloyal persons into the ranks of its employees, equal protection must be afforded loyal employees from unfounded accusations of disloyalty."

In undertaking to "hold a hearing and reach its own decision" in petitioner's case, the Board relied on Regulation 14 as the source of its authority.

This regulation, however, is valid only if it is "not inconsistent with the provisions of this order." The Board's "post-audit" function, when used to survey the operation of the loyalty program and to insure a uniformity of procedures in the various loyalty boards, might well be justified under the Board's powers to "Advise all departments and agencies on all problems relating to employee loyalty" and "Coordinate the employee loyalty policies and procedures of the several departments and agencies." But the regulation did not restrict the "post-audit" function to advice and coordination. Rather, it purported to allow the Board "to call up for review any case . . . even though no appeal has been taken" and to hold a new hearing and "after such hearing [to] affirm or reverse the original determination or decision." The Board thus sought to do by regulation precisely what it was not permitted to do under the Order. Although the Order limited the Board's jurisdiction to appeals from adverse rulings, the regulation asserted authority over appeals from favorable rulings as well; and although the Order limited the Board's jurisdiction to appeals referred

to the Board by the employee or his department or agency, the regulation asserted authority in the Board to adjudicate individual cases on its own motion. To this extent the regulation must fall. See, *e. g., Addison* v. *Holly Hill Fruit Products,* 322 U. S. 607, 616–618, and *Federal Communications Commission* v. *American Broadcasting Co.,* 347 U. S. 284, 296–297.

Our interpretation of the language of the Order is confirmed by *The Report of the President's Temporary Commission on Employee Loyalty,* released by the President on March 22, 1947, simultaneously with the Order. Four months before, the Commission had been established "to inquire into the standards, procedures, and organizational provisions for (a) the investigation of persons who are employed by the United States Government or are applicants for such employment, and (b) the removal or disqualification from employment of any disloyal or subversive person." [11] In conducting its investigation, the Commission sought suggestions from 50 selected government agencies. The replies revealed general agreement "that the employing agency be responsible for the removal of its own employees." [12] But a substantial number of the replies indicated: [13]

"(1) that there should be established an independent over-all centralized authority acting solely for and on behalf of the President in the matter of the removal of disloyal employees; or (2) that the original hearing in loyalty cases should be within the employing agency, subject to a right of appeal to a central-

[11] Executive Order 9806, 11 Fed. Reg. 13863. The Commission was composed of officials of the Civil Service Commission and the Departments of Justice, State, Treasury, War, and Navy.

[12] The Report of the President's Temporary Commission on Employee Loyalty (1947) 14.

[13] *Id.,* at 15.

ized agency established with a power to review *de novo;* or (3) that the overall agency be established with advisory powers only."

Of these three proposals, the first was flatly rejected by the Commission, which instead urged the establishment of a centralized agency combining elements of the second and third. The Commission thought it "imperative that the head of each department or agency be solely responsible for his own loyalty program." [14] On the other hand, "so that the loyalty procedures operative in each of the departments and agencies may be properly coordinated . . . ," the Commission recognized "that a central review board should be created with definite advisory responsibilities in connection with the loyalty program." [15] These "advisory responsibilities" were envisaged as "similar to those of a clearing house." [16] But, in addition, the board was to be authorized to review decisions adverse to employees, when referred to the board by the employee or the employing agency.[17] Nowhere in the report was it even remotely suggested that the board was to have general jurisdiction to adjudicate individual cases; on the contrary, as already noted, the Commission expressly disapproved such a proposal. The Commission's recommendations, with only slight changes in language, were adopted in the provisions of the Order designating the functions of the Loyalty Review Board.[18]

While loyalty proceedings may not involve the imposition of criminal sanctions, the limitation on the Board's review power to adverse determinations was in keeping with the deeply rooted principle of criminal law that a

---

[14] *Id.*, at 26.

[15] *Id.*, at 27.

[16] *Id.*, at 26.

[17] *Id.*, at 35–36.

[18] See Bontecou, The Federal Loyalty-Security Program (1953), 29.

verdict of guilty is appealable while a verdict of acquittal is not.[19]  This safeguard was one of the few, and perhaps one of the most important, afforded an accused employee under the Order.  Its effect was to leave the initial determination of his loyalty to his co-workers in the department—to his peers, as it were—who knew most about his character and his actions and his duties.  He was thus assured that his fate would not be decided by political appointees who perhaps might be more vulnerable to the pressures of heated public opinion.  To sanction the abrogation of this safeguard through Regulation 14, in the face of the Order's language and the Commission's report, would be to sanction administrative lawlessness. Agencies, whether created by statute or Executive Order, must of course be free to give reasonable scope to the terms conferring their authority.  But they are not free to ignore plain limitations on that authority.  Compare *United States* v. *Wickersham*, 201 U. S. 390, 398.

It is urged, however, that the President's failure to express his disapproval of Regulation 14 must be deemed to constitute acquiescence in it.  From this, it is contended that the President thus impliedly expanded the Loyalty Review Board's powers under the Order.  We cannot indulge in such fanciful speculation.  Nothing short of explicit Presidential action could justify a conclusion that the limitations on the Board's powers had been eliminated.  No such action by the President has been brought to our attention.  There is, in fact, no evidence that the President even knew of the Board's

---

[19] See the Commission's report, *supra,* note 12, at 30:
"The standards must be specific enough to assure that innocent employees will not fall within the purview of the disloyalty criteria. Every mature consideration was invoked by the Commission to afford maximum protection to the government from disloyal employees while safeguarding the individual employee with a maximum protection from ill-advised accusations of disloyalty."

practice prior to April 27, 1953, three weeks after the Board had notified petitioner of its intention to "hold a hearing and reach its own decision." And knowledge of the practice can hardly be imputed to him in view of the relatively small number of cases—only 20—in which the Board reversed favorable determinations over its 6-year life.[20] On April 27, 1953, the President issued Executive Order 10450, revoking Executive Order 9835 and establishing a new loyalty program.[21] Executive Order 10450 by its own terms did not take effect until 30 days later on May 27, 1953. Although petitioner's case was heard and determined by the Loyalty Review Board during this 30-day period and hence was not subject to Executive Order 10450, the Government contends that § 11 evidences knowledge and approval of Regulation 14.[22]

---

[20] As of June 30, 1953, the Board had undertaken in only 58 cases to "hold a hearing and reach its own decision" despite a favorable determination below. Annual Reports of the Civil Service Commission: 1948 (p. 18), 1949 (p. 37), 1950 (pp. 33–34), 1951 (p. 36), 1952 (p. 56), 1953 (p. 31). Of these 58 cases, 20 resulted in reversal of the favorable determination. 1953 Report, p. 31, n. 1. Of these 20 cases, 12—including petitioner's—arose in the fiscal year immediately preceding June 30, 1953. *Id.*, at 31. In the remaining 38 cases—those in which the Board did not reverse the favorable determination—either the Board affirmed the favorable determination or the employee resigned prior to the scheduled hearing. Thus in the 1953 fiscal year, of the 22 hearings scheduled, 8 resulted in affirmance and 2 were cancelled because of resignation. *Ibid.*

[21] 18 Fed. Reg. 2489.

[22] Section 11 provides in pertinent part:

"On and after the effective date of this order the Loyalty Review Board established by Executive Order No. 9835 of March 21, 1947, shall not accept agency findings for review, upon appeal or otherwise. Appeals pending before the Loyalty Review Board on such date shall be heard to final determination in accordance with the provisions of the said Executive Order No. 9835, as amended. Agency determinations favorable to the officer or employee concerned pending before the Loyalty Review Board on such date shall be acted upon by such

Section 11, however, did no more than recognize that cases under Regulation 14 might be pending on the effective date and authorize their determination thereafter. And, even as to these cases, § 11 did not authorize the Board to recommend dismissal; at most the Board could remand the cases to the departments or agencies for reconsideration. With respect to cases determined *prior* to the effective date—such as petitioner's—§ 11 surely affords no basis for divining a Presidential intention to authorize the Board to disregard its previously. defined jurisdictional boundaries. Particularly is this so where, as here, substantial rights affecting the lives and property of citizens are at stake. This Court has recognized that "a badge of infamy" attaches to a public employee found disloyal. *Wieman* v. *Updegraff,* 344 U. S. 183, 191. The power asserted by the Board to impose such a badge on petitioner cannot be supported on so tenuous a theory as that pressed upon us.

Nor was the adjudication of petitioner's case, on its own motion and despite a favorable determination by the Agency Board, the only unwarranted assumption of power by the Loyalty Review Board. In cancelling petitioner's eligibility from "the Federal service" for a period of three years, the Board purported to act under Civil Service Rule V, § 5.101 (a), which bars an employee from *"the competitive service* within 3 years *after a final determination* that he is disqualified for Federal employment because of a reasonable doubt as to his loyalty . . . ." [23] The Board's order of debarment, however, was not limited to "the competitive service" but extended to all federal employ-

Board, and whenever the Board is not in agreement with such favorable determination the case shall be remanded to the department or agency concerned for determination in accordance with the standards and procedures established pursuant to this order."

[23] Italics added. 5 CFR (1954 Supp.) § 5.101 (a).

ment.[24]   And although such a "final determination" could be made only by the employing agency, the Board did not wait for respondent Hobby to act on its recommendation.   Petitioner's debarment was made effective on May 18, 1953, four days before the Chairman of the Board wrote petitioner of the Board's determination and nearly four weeks before the Department took action to remove petitioner from his position.   The Board's haste can be understood only in terms of its announced intention to deprive agencies of all discretion to determine whether the Board's recommendations should be accepted.[25]

## IV.

There only remains for consideration the question of relief.   Initially petitioner is entitled to a declaratory judgment that his removal and debarment were invalid.

---

[24] Approximately 15% of all federal employees are excepted from "the competitive service."   1954 Annual Report, United States Civil Service Commission, p. 10.   Petitioner himself was not employed in "the competitive service."   His position was classified in "Schedule A," an exempt category.   5 CFR § 6.101 (n); 5 CFR § 6.1 (d).

[25] On December 17, 1948, the Board issued the following directive, entitled "Legal effect of advisory recommendations," to the departments and agencies covered by the Order:

"The President expects that loyalty policies, procedures, and standards will be uniformly applied in the adjudication of loyalty cases by the several agencies, and the responsibility for coordinating the program and assuring uniformity has been placed in the Loyalty Review Board.   The recommendations of the Civil Service Commission in cases of employees covered by section 14 of the Veterans' Preference Act of 1944 are mandatory, and the loyalty of persons not covered by section 14 should be judged by the same standards.   Therefore, if uniformity is to be attained *it is necessary that the head of an agency follow the recommendation of the Loyalty Review Board in all cases.*" (Italics added.)

13 Fed. Reg. 9372, 5 CFR § 220.4 (d).   See Bontecou, The Federal Loyalty-Security Program (1953), 54–55.   Compare *Kutcher* v. *Gray,* 91 U. S. App. D. C. 266, 199 F. 2d 783.

He is further entitled to an order directing the respondent members of the Civil Service Commission to expunge from its records the Loyalty Review Board's finding that there is a reasonable doubt as to petitioner's loyalty and to expunge from its records any ruling that petitioner is barred from federal employment by reason of that finding. His prayer for reinstatement, however, cannot be granted, since it appears that the term of petitioner's appointment would have expired on December 31, 1953, wholly apart from his removal on loyalty grounds.

The judgment below is reversed and the cause is remanded to the District Court for entry of a decree in conformity with this opinion.

*Reversed.*

Mr. Justice Black, concurring.

I would prefer to decide this case on the constitutional questions discussed by Mr. Justice Douglas or on some of the other constitutional questions necessarily involved. See *United States* v. *Lovett,* 328 U. S. 303. See my dissents in *Dennis* v. *United States,* 341 U. S. 494, 579–581; *Communications Assn.* v. *Douds,* 339 U. S. 382, 445–453. See also my concurring opinion in *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 142–149. I agree that it is generally better for this Court not to decide constitutional questions in cases which can be adequately disposed of on non-constitutional grounds. See *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 553. But this generally accepted practice should not be treated as though it were an inflexible rule to be inexorably followed under all circumstances. See *Youngstown Co.* v. *Sawyer,* 343 U. S. 579, 584–585. Here, as in the *Youngstown* case, I think it would be better judicial practice to reach and decide the constitutional issues, although I agree with the Court that the Presidential Order can justifiably be construed

as denying the Loyalty Review Board the power exercised in this case. For this reason I join the opinion of the Court. But I wish it distinctly understood that I have grave doubt as to whether the Presidential Order has been authorized by any Act of Congress. That order and others associated with it embody a broad, far-reaching espionage program over government employees. These orders look more like legislation to me than properly authorized regulations to carry out a clear and explicit command of Congress. I also doubt that the Congress could delegate power to do what the President has attempted to do in the Executive Order under consideration here. And of course the Constitution does not confer lawmaking power on the President. *Youngstown Co.* v. *Sawyer,* 343 U. S. 579.

I have thought it necessary to add these statements to the Court's opinion in order that the President's power to issue the order might not be considered as having been decided *sub silentio.*

MR. JUSTICE DOUGLAS, concurring.

With all deference, I do not think we can avoid the constitutional issue in this case.

The most that can be said is that the terms of the Executive Order are ambiguous. The construction urged by the Attorney General is buttressed by a history of administrative practice, with case after case being reviewed by the Board in the precise manner of this one. The question of construction of the Executive Order was so well settled that neither the Government nor Dr. Peters suggested the absence of authority in the Review Board to take jurisdiction of this case on its own motion. I agree that it had such authority. It, therefore, becomes necessary for me to reach the constitutional issue.

Dr. Peters was condemned by faceless informers, some of whom were not known even to the Board that con-

demned him.  Some of these informers were not even under oath.  None of them had to submit to cross-examination.  None had to face Dr. Peters.  So far as we or the Board know, they may be psychopaths or venal people, like Titus Oates, who revel in being informers.  They may bear old grudges.  Under cross-examination their stories might disappear like bubbles.  Their whispered confidences might turn out to be yarns conceived by twisted minds or by people who, though sincere, have poor faculties of observation and memory.

Confrontation and cross-examination under oath are essential, if the American ideal of due process is to remain a vital force in our public life.  We deal here with the reputation of men and their right to work—things more precious than property itself.  We have here a system where government with all its power and authority condemns a man to a suspect class and the outer darkness, without the rudiments of a fair trial.  The practice of using faceless informers has apparently spread through a vast domain.  It is used not only to get rid of employees in the Government, but also employees who work for private firms having contracts with the Government.[1]  It

---

[1] Berle, The 20th Century Capitalist Revolution (1954), pp. 92–93, traces the impact of the loyalty program on employees of corporations having contracts with the Government:

"To begin, let us deal with a situation in which a powerful corporation is under a contract duty to the United States government, or some agency of it, to fire or decline to hire individuals designated to them as possible security risks.  In practice they mean that a man who may have been employed for years, being suspect for some reason, is designated to the appropriate authorities [of the corporation].  Things then happen to him rapidly.  All he knows is that he is called into the office one day and told that he is discharged—or at best transferred to some far less desirable job.  If the ban is complete, and he lives in any of the cities in which the corporation is a preponderant employer, the consequences are extreme.  The main avenue of employment is closed to him.  He must move into some

has touched countless hundreds of men and women and ruined many. It is an un-American practice which we should condemn. It deprives men of "liberty" within the meaning of the Fifth Amendment, for one of man's most precious liberties is his right to work. When a man is deprived of that "liberty" without a fair trial, he is denied due process. If he were condemned by Congress and made ineligible for government employment, he would suffer a bill of attainder, outlawed by the Constitution. See *United States* v. *Lovett,* 328 U. S. 303. An administrative agency—the creature of Congress—certainly cannot exercise powers that Congress itself is barred from asserting. See the opinion of MR. JUSTICE BLACK in *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 144–146.[2]

Those who see the force of this position counter by saying that the Government's sources of information must be protected, if the campaign against subversives is to be successful. The answer is plain. If the sources of information need protection, they should be kept secret. But once they are used to destroy a man's reputation and deprive him of his "liberty," they must be put to the test of due process of law. The use of faceless informers is wholly at war with that concept. When we relax our standards to accommodate the faceless informer, we violate our basic constitutional guarantees and ape the tactics of those whom we despise.

---

other city and find some other job if he can. Since the same ban will probably follow him into any other plant engaged in defense orders, the going is rough. If he is a young man, he winds up in some recognizably marginal job, such as dishwashing or unskilled labor. If he is a man in middle life, he may end on the industrial scrap heap. Probably he never discovers exactly what hit him. The personnel people of the corporations do not confide to him their reasons for action."

[2] See Berle, *op. cit. supra,* p. 98.

MR. JUSTICE REED, with whom MR. JUSTICE BURTON joins, dissenting.

I agree with MR. JUSTICE DOUGLAS that the Court's reason for annulling Dr. Peters' discharge is not sound. In addition to the reasons stated by him, I find other factors that, to me, strengthen the view that the action of the Loyalty Review Board was not invalid. However, I do not express any opinion on the constitutional problems which might ultimately be faced if the Court had found that the Review Board's action and all other nonconstitutional aspects of the case were proper.

Executive Order No. 9835 was issued by the President on March 21, 1947. By this order he established the Loyalty Review Board and granted to it certain rule-making powers. Part III, § 1 b, Exec. Order No. 9835. The Review Board's first promulgation of regulations pursuant to this power included the original of Regulation 14, which provided that the Board had the right "on its own motion" to review the decisions of the department or agency loyalty boards "even though no appeal has been taken." 13 Fed. Reg. 255 (adopted December 17, 1947). Thus, from the very outset, the procedure followed by the Review Board in reviewing these cases was part of the loyalty program. Furthermore, from 1948 through 1952, in each of the Annual Reports of the Civil Service Commission, the results of the Review Board's post-audit actions under Regulation 14 were unmistakably recorded.[1] These reports were submitted to the President pursuant to statutory requirement.[2] In addition to stating annual data on general post-audit reviews (more than 5,000 in 1952), the reports clearly indicated that the Board was rehearing cases on its own motion, such as the present,

---

[1] Annual Reports of the Civil Service Commission: 1948 (p. 18); 1949 (pp. 37–38); 1950 (pp. 33–34); 1951 (p. 36); 1952 (p. 56).

[2] 5 U. S. C. § 633 (5).

where the decision of the agency loyalty board had been favorable to the employee.[3] The Court places emphasis on the number of cases so handled, but this hardly seems relevant in view of the fact that the reports indisputably conveyed to any reader the fact of what the Board was doing, whether in 1 case or 100.

The Court in this case is reviewing a Presidential Order and rules made thereunder. I do not find it as easy as does the majority to analogize such review to judicial review of congressional Acts and administrative interpretation of such Acts. Certain differences are immediately apparent. The Executive Branch is traditionally free to handle its internal problems of administration in its own way. The legality of judicial review of such intra-executive operations as this is, for me, not completely free from doubt. However, construing the Loyalty Order as the Court does, like a statute, the contemporaneous construction of the Order by the Review Board in promulgating Regulation 14, and the action of the President in allowing the regulation and practices thereunder to continue after having notice from the Civil Service Commission reports, lead me to conclude that the Board by Regulation 14

---

[3] "During the fiscal year 1952, the Loyalty Review Board post-audited 5,335 cases which had been decided favorably by agencies and regional loyalty boards. The Board authorized the closing of 5,259 of these cases upon finding that proper procedures had been followed. In 66 other cases, however, further processing was necessary to ensure compliance with standard procedures, and so the cases were remanded to boards in the agencies or in civil-service regions.

"The Board scheduled review of the other 10 cases on their merits and offered to hear the individuals concerned before rendering its decision on their cases. One case was closed as incomplete when the individual resigned. Action on the other 9 cases was completed; since this type of review of a case under Regulation 14 is similar to the consideration given an appeal, the cases of these individuals are included in the following section, which shows action on appeals received by the Loyalty Review Board." 69th Annual Report (1952), Civil Service Commission, p. 56.

correctly interpreted the Presidential intention conveyed by Executive Order 9835. Such reasonable interpretation promptly adopted and long-continued by the President and the Board should be respected by the courts. That has been judicial practice heretofore.[4]

Nor does comparison of Regulation 14 with the Order show, in my opinion, that the Regulation is "inconsistent with" any of the provisions of the Order. Rather the power of the Review Board to review under Regulation 14 appears to be supplemental to the other procedures which the Order itself prescribes. Therefore Regulation 14 constituted merely an implementation of the Order which the Review Board is specifically authorized to make under Part III, § 1b, set out in the Court's opinion, p. 340. Neither of the parties has contended otherwise before this Court. They also agree that the Board's action was valid.

Undoubtedly the President had knowledge and approved of the Regulation. This is shown by his specific recognition of such cases in his own 1953 Order.[5] That Order, while not controlling Dr. Peters' case directly, since it did not become effective until after the Review Board had heard his case, recognized that the Review Board had been and could review decisions which had been favorable to an employee. This action by the President amounts to approval of the practice of the Review Board under Regulation 14. I am therefore compelled to conclude that the action of the Review Board in rendering its advisory recommendation in this case was not invalid.

---

[4] Cf. *United States* v. *American Trucking Assns.*, 310 U. S. 534, 549; *Bowles* v. *Seminole Rock Co.*, 325 U. S. 410, 413–414; *Federal Crop Insurance Corp.* v. *Merrill*, 332 U. S. 380; *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 313, 315; *Helvering* v. *Winmill*, 305 U. S. 79, 83.

[5] Exec. Order No. 10450, § 11, promulgated April 27, 1953, to become effective May 27, 1953. Set out in the Court's opinion, n. 22.

The Court seems to imply, however, that the Review Board's decision was more than merely a recommendation to the head of the department employing Dr. Peters and that the Board, in another "unwarranted assumption of power," by its letter of May 22, 1953, erroneously separated Dr. Peters from the government service. Nowhere in the majority opinion does it appear that Secretary Hobby or the Department she heads, and for whom Dr. Peters worked, ever took any action in regard to the Review Board's recommendation. The reference to this May 22 letter is apt to mislead, as it has nothing to do with the Department's discharge of Dr. Peters, the validity of which is the issue in this case.

I agree that the Review Board's letter of May 22, 1953, may have been erroneous. Under Civil Service Rule V, § 5.101 (a),[6] federal employees found disqualified for federal employment because of a reasonable doubt as to their loyalty are barred from the federal competitive service for three years. This "final determination" as to loyalty is and can be made only by the head of a department or agency on recommendation of a loyalty board.[7]

---

[6] "Persons disqualified for appointment. . . . *Provided,* That no person shall be admitted to competitive examination, nor shall he be employed in any position in the competitive service within 3 years after a final determination that he is disqualified for Federal employment because of a reasonable doubt as to his loyalty to the Government of the United States." 5 CFR, 1949 ed. (1954 Cum. Supp.), § 5.101 (a).

[7] Exec. Order No. 9835, Part II:

"1. The head of each department and agency in the executive branch of the Government shall be personally responsible for an effective program to assure that disloyal civilian officers or employees are not retained in employment in his department or agency.

.        .        .        .        .

"2. The head of each department and agency shall appoint one or more loyalty boards, . . . for the purpose of hearing loyalty cases arising within such department or agency and making recommenda-

When the head of a department acts on the Review Board's recommendation, § 5.101 (a) becomes effective. The Review Board, acting as an agency of the Civil Service Commission, then notifies the employee of his disqualification. Assuming that the Review Board was not notified of any "final determination" prior to the letter of May 22, it was sent erroneously. However, it amounted to no more than a nullity and Dr. Peters lost nothing. It is undisputed that on June 12, 1953, the Surgeon General of the Public Health Service, a subordinate of Secretary Hobby, "notified plaintiff of his separation from his position as Special Consultant." [8] This was the notification which effectively separated him from government service and which is the basis for his complaint for wrongful discharge.

Limiting myself to issues decided by the majority, I dissent.

---

tions with respect to the removal of any officer or employee of such department or agency on grounds relating to loyalty, and he shall prescribe regulations for the conduct of the proceedings before such boards.

.  .  .  .  .

"3. A recommendation of removal by a loyalty board shall be subject to appeal by the officer or employee affected, prior to his removal, to the head of the employing department or agency or to such person or persons as may be designated by such head, under such regulations as may be prescribed by him, and the decision of the department or agency concerned shall be subject to appeal to the Civil Service Commission's Loyalty Review Board, hereinafter provided for, for an advisory recommendation."

*Id.*, Part III, 1:

"a. The [Review] Board shall have authority to review cases involving persons recommended for dismissal on grounds relating to loyalty by the loyalty. board of any department or agency and to make advisory recommendations thereon to the head of the employing department or agency. . . ."

[8] Petitioner's complaint, ¶ 27.