338 So.2d 1347 (1976)
LOUISIANA STATE BAR ASSOCIATION
v.
Philip J. SHAHEEN, Jr.
No. 55432.
Supreme Court of Louisiana.
September 13, 1976.
Rehearing Denied November 5, 1976.
Dissenting Opinion November 17, 1976.
*1348 Henry A. Politz, Chairman, Shreveport, Wood Brown, III, New Orleans, Sam J. D'Amico, Baton Rouge (Recused), Leonard Fuhrer, Alexandria, Harold J. Lamy, New Orleans, Edgar H. Lancaster, Jr., Tallulah, John F. Pugh, Thibodaux, A. Russell Roberts, Metairie, John B. Scofield, Lake Charles, Thomas O. Collins, Jr., New Orleans, Counsel, Louisiana State Bar Ass'n, Committee on Professional Responsibility, for plaintiff-petitioner.
Alfred A. Mansour, Alexandria, for defendant-respondent.
DIXON, Justice.
The Louisiana State Bar Association, through its Committee on Professional Responsibility, instituted this disbarment proceeding against Philip J. Shaheen, Jr.; the basis was Shaheen's conviction in federal court of mail fraud and conspiracy. A hearing was held before John Dale Powers, appointed commissioner by this court. The commissioner found that the conviction evidences both a lack of honesty and trustworthiness and represents a serious crime. Disbarment was deemed an appropriate disciplinary action.
On December 18, 1970 a federal jury convicted Philip J. Shaheen, Jr. of three counts of conspiracy and mail fraud, in violation of *1349 18 U.S.C., §§ 371[1] and 1341.[2] This conviction was affirmed by the United States Fifth Circuit Court of Appeals sub nom. United States v. Perez, 489 F.2d 51 (1973). Rehearing and rehearing en banc were denied on January 2, 1974. The United States Supreme Court denied Shaheen's application for a writ of certiorari on June 10, 1974.
This conviction grew out of a scheme, involving several lawyers and doctors, to defraud insurance companies by staging fake accidents, after which the allegedly injured participants in the accidents would retain lawyers to represent them in their claims. Chief Judge John Brown of the Fifth Circuit described the scheme as follows:
"The facts of this case, in a purely legalistic sense, need no embellishment in a literary sense to classify this as a piece of prose that could well be called a second `American tragedy.' It would be an American tragedy, not only because the events took place here, but because it is just another instance in which large numbers of Americans get willingly involved in enterprises which reflect a lack of compunction, possibly even a proclivity, to enter into the proverbial `get-rich-quick scheme' evidencing not only a disregard for law but, sadly, also a deafness to conscience. As we undertake our profound but prosaic role of adjudicating these cases, what we see is not pleasant. It reveals a wreckage of promising professional careers, evidence of deliberate and unabashed attempts to prey upon financially pressed expectant mothers for gain and the seemingly all too eager participation by a large cast of characters in a patently illegal undertaking.

The Scheme
A recital of the facts must precede resolution of the issues raised on appeal. The Louisiana-wide get-rich-quick scheme involved the staging of fraudulent automobile accidents for the purpose of creating false personal injury claims. These claims would be submitted to the insurance carriers for the respective vehicles involved in the wrecks with the aid and contrivance of certain physicians and lawyers.
As the scheme evolved, the participants even coined their own terminology which, though alien to the unintiated, became known to all those who participated. This glossary of modern day crookedness was quite descriptive. Certain participants were known as `recruiters'. The recruiters function, not unnaturally, was to recruit others who assumed titles commensurate with their organizational function. There were the `hitters', whose function it was to drive the `hitter' vehicle in each collision which supposedly was to be liable for causing the accident. Then there was the `target' vehicles. The occupants of the `target' were known as *1350 the `driver' and the `riders'. It was determined at the outset that pregnant women made exceptionally good riders as they could claim pregnancy related injuries which would be both hard to disprove and easily settleable with the insurance carriers. Throughout the scheme there was an effort made on the part of the participants to use vehicles and drivers which were covered by high limits of liability insurance.
According to a pre-arranged timetable, the `hitter' vehicle would strike the `target' vehicle either broadside or in the rear end. The occupants of the `target' vehiclethe driver and ridersand occasionally some of those in the `hitter' vehicle, feigning injuries, would be sent to a particular doctor and lawyer who would facilitate phony claims by creating a medical history for treatment of non-existent injuries and making a demand on the appropriate insurance company.
The key to immediate financial gain in each staged collision was advances paid by the attorneys to the `riders' for whom allegedly false claims were being submitted. These advances were paid in the form either of cash payments or loans from local financial institutions, co-signed by the attorney handling the claim. Of the usual advance ranging from $250 to $500, part was retained by the rider-claimant with the rest being distributed among the organizers, recruiters, and others who assisted with various aspects of staging the wreck. When the claim was ultimately settled with the insurance carrier, the proceeds would be applied to (i) repay the advancing attorney or in such cases, to liquidate the guaranteed bank loan and (ii) to pay the inflated doctor's bill, not infrequently, with kickbacks going to both the organizers and the participating attorneys in addition to their usual shares." U. S. v. Perez, 489 F.2d 51, 54-55. (Footnotes omitted).
Several objections to the commissioner's findings of fact and conclusions of law have been raised by respondent, who first contends that this proceeding is premature because his conviction is not yet final, there being an appeal presently pending in the Fifth Circuit from a ruling by a federal district judge that denied his motion for a new trial.
Article XV, § 8, paragraph 7 of the Articles of Incorporation of the Louisiana State Bar Association, under which this proceeding was brought, provides:
"(7) After the conviction has become final, that is, all appeals have been concluded or exhausted, the procedure shall be as follows:
(a) The Committee will file a petition in the Supreme Court seeking disbarment or any other remedy that the Committee deems appropriate, and the petition will be served upon the respondent in the same manner as in ordinary proceedings.
(b) When issue is joined by answer by the respondent, a Commissioner will be appointed by the Supreme Court to represent the Court in the same manner as in ordinary proceedings.
(c) At the hearing before the Commissioner, the certificate of the conviction of the respondent shall be conclusive evidence of his guilt of the crime for which he has been convicted.
(d) At the hearing based upon a respondent's conviction of a crime, the sole issue to be determined shall be whether the crime warrants discipline, and if so, the extent thereof. At the hearing the respondent may offer evidence only of mitigating circumstances not inconsistent with the essential elements of the crime for which he was convicted as determined by the statute defining the crime."
Respondent's conviction became final in June of 1974, twenty-five days after the United States Supreme Court denied his application for a writ of certiorari. Rule 58 of the Rules of the Supreme Court of the United States. See Louisiana State Bar Association v. Ponder, 263 La. 743, 269 So.2d 228 (1972). The appeal on which respondent relies is a post-conviction application for a new trial, first filed in December of 1972 after the first appeal from the conviction was taken April 29, 1971. The *1351 possibility of post-conviction relief through applications for writs of habeas corpus or motions for new trials does not affect the finality of the conviction. Louisiana State Bar Association v. Ponder, supra.
Next, respondent contends that Article XV, § 8, paragraph 7(c), relating to the certificate of conviction being conclusive evidence of guilt, is not applicable because his conviction on December 18, 1970 occurred before the effective date of this article, September 1, 1971. This argument has no merit. The conviction became final in June of 1974, twenty-five days after the United States Supreme Court denied writs. Article XV, § 8, paragraph 7 was effective when the conviction became final and is applicable to this proceeding. Louisiana State Bar Association v. Ponder, supra.
Finally, respondent contends that the commissioner erred in refusing to consider the testimony offered by the respondent, through various witnesses, affidavits and transcripts, tending to negate his guilt of the crime charged. Specifically, respondent attempted to show through various witnesses that he had no knowledge of the fact that the accidents were staged.
The commissioner's ruling is correct. Paragraph 7(c) and (d) of Article XV, § 8 provides:
"(c) At the hearing before the Commissioner, the certificate of the conviction of the respondent shall be conclusive evidence of his guilt of the crime for which he has been convicted.
(d) At the hearing based upon a respondent's conviction of a crime, the sole issue to be determined shall be whether the crime warrants discipline, and if so, the extent thereof. At the hearing the respondent may offer evidence only of mitigating circumstances not inconsistent with the essential elements of the crime for which he was convicted as determined by the statute defining the crime."
Accepting respondent's position would require the committee to try the respondent anew for the crime of which he clearly stands convicted. This is unrealistic and not contemplated by the articles of incorporation. Rather, under 7(c), supra, the certificate of conviction "shall be conclusive evidence of his guilt of the crime."
Respondent, at the hearing, may introduce "evidence only of mitigating circumstances not inconsistent with the essential elements of the crime for which he was convicted." An essential element of the crime for which respondent was convicted is knowledge. 18 U.S.C. § 371. United States v. Johnson, 504 F.2d 622 (7th Cir. 1974); United States v. Roselli, 432 F.2d 879 (9th Cir. 1970). Thus, evidence that respondent had no knowledge of the fact that the accidents were staged is inconsistent with an essential element of the crime for which he was convicted, and hence inadmissible at the hearing.
"Mitigating circumstances" are such as do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability. See In re Greiner, 61 Wash.2d 306, 378 P.2d 456 (1963). Respondent argues that the testimony of these witnesses is relevant, even if he cannot be heard to contest his guilt of the crime, to show that his participation in the scheme was somehow lesser than others, i.e., he was on the periphery of the scheme, not in the center.
We believe, however, that such evidence is not evidence of "mitigating circumstances not inconsistent with the essential elements of the crime." Rather, such evidence goes to the guilt or innocence of the respondent. The committee is not a jury. The jury at his trial found sufficient evidence to prove him guilty beyond a reasonable doubt of mail fraud and conspiracy. The jury determined that Shaheen was not so far toward the periphery of the scheme that he was guiltless, but that he was so directly involved that he was guilty beyond a reasonable doubt. The committee can hear evidence in mitigation, extenuating circumstances which tend to diminish the need for punishment, but it need not hear evidence tending to show only that respondent *1352 did not commit the act for which he was convicted.
As to the merits, we agree with the commissioner's finding that the offenses for which Shaheen stands convicted are serious enough to warrant discipline. The remaining issue is the extent of discipline.
The crimes involved in this case strike at the very heart of our legal profession. Respondent stands convicted by a jury of participating in a scheme to defraud insurance companies by the staging of fake accidents, resulting in fake injuries, for which damages were sought and received from unwitting insurers. Respondent Shaheen's part in this episode is summed up by Chief Judge Brown:
"The convicted professionals, five lawyers and two physicians in number, are unanimous in their contention that they were misled by both their clients, or patients as the case was, and the DeMary brothers as to the fraudulent character of the collisions. They contend that the testimony relied on to establish their knowing complicity was self-serving, uncorroborated and unreliable. Appellants point to certain testimony by the government's key witnesses which was controverted by others of the government's witnesses and argue tenaciously that these inconsistencies undermine from the validity of the verdict.
We find these contentions without merit. Not only do we refuse to invade the province of the jury, except where the most compelling absence of evidence so dictates, here we perceive much more than the slight evidence required. Tomplain v. United States, [5 Cir., 1930, 42 F.2d 202] supra. Other than the testimony of Kenneth and Larry DeMary and others similarly situated, which is assailed on common grounds (see, notes 41 and 42, supra), the showing on the crucial question of knowledge on the part of the convicted professionals was entirely circumstantial. Nonetheless, it was substantial. Repeatedly, the lawyers dealt, not with their clients, but directly with the DeMary brothers and their appointees. Money exchanged hands, employment contracts were signed, and promissory notes were executed without the lawyers ever having laid eyes on the second party to the transaction. . . .

. . . . .
. . .Appellant Shaheen, Hennigan's law partner in Lake Charles, was initially charged in counts I through VI and XIII of the indictment. [See App. I: (4); App. II: (3)]. Counts V, VI, and XIII against him were ultimately sent to the jury for which convictions were returned. Evidence adduced by the government established Shaheen's participation in at least one other staged collision, in addition to the June 1, 1966 and July 14, 1966 [App. I: (11), (13); App. II: (6)(8)] accidents, which formed the basis for counts V and VI of the indictment respectively, and the January 5, 1966 accident, evidence of which was stricken by the trial court. He was also charged with two overt acts, reference to one of which was stricken with the January 5, 1966 accident, the remaining two arising out of the July 14, 1966 staged collisions in Sulfur. [See App. I: (13); App. II: (8)]. Again, we conclude that sufficient evidence was adduced to support the jury's finding that appellants Hennigan and Shaheen were apprised of the fraudulent nature of the collisions and knowingly entered into the overall agreement. There was direct testimony adduced that appellant Hennigan and Shaheen represented claimants in staged collisions without ever conferring with or even seeing the clients from beginning to end. Again, as with Tunis and Loridans the signing of employment contracts, execution of promissory notes, and exchange of money occurred between the appellant attorneys and one of the DeMary brothers. There is direct testimony that both of these appellant attorneys were fully aware of the fraudulent nature of the collisions. Testimony established that subsequent to the February 17, 1966 collision in Monroe, Louisiana [App. I: (6); App. Ill: (2)] one of the claimants represented *1353 by Hennigan was unavailable to endorse the settlement check and sign the release. To solve this problem Kenneth DeMary, in Hennigan's presence, signed the claimant's name to the check and release after which Hennigan notarized the release, certifying that the claimant had personally appeared before him. There was testimony also that appellant attorney Shaheen customarily demanded and received `kick-backs' in addition to his regular fee for those staged collisions in which he represented claimants. Following the June 1, 1966 collision, one of the claimants testified that upon receiving from Shaheen an advance on the anticipated settlement, the bulk of the advance was turned over to appellant Prudhomme for transmission to the DeMarys. There is direct testimony that Shaheen had counseled the DeMary brothers on the type of injuries the claimants should complain of and stated that whiplash injuries could not be detected by means of x-rays. It was testified that he further suggested that pregnant women be used as riders where possible, so they could claim various pregnancy related injuries incurred in the collisions.
Further testimony from two witnesses indicated that upon learning that appellant DeVille had absconded with the money advanced to the claimants after the July 14, 1966 accident [App. I: (13); App. II: (8)], both Shaheen and Hennigan were fearful that DeVille would ultimately inform on them to the authorities." 489 F.2d 51, 72-75. (Footnotes omitted).
Respondent's conduct was not only reprehensible, but also violated basic tenants of our profession. Disciplinary Rule 7-102 provides:
"(A) In his representation of a client, a lawyer shall not:
(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.
(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law.
(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.
(4) Knowingly use perjured testimony or false evidence.
(5) Knowingly make a false statement of law or fact.
(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.
(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.
(B) A lawyer who receives information clearly establishing that:
(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal.
(2) A person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal."
See also DR 1-102(4); DR 2-109(1); DR 2-110.
It is appropriate to repeat at this point that a disbarment proceeding is not so much for the punishment of the attorney as it is for the preservation of the integrity of the courts and the salutary effect it has upon other members of the bar. We are impressed with the obvious disregard by respondent of established ethical standards. His fraudulent activities reflect his lack of moral fitness for the practice of law.
Accordingly, for the reasons assigned, it is ordered, adjudged and decreed that the name of Philip J. Shaheen, Jr., respondent herein, be stricken from the Roll of Attorneys *1354 and his license to practice law in the State of Louisiana be revoked and the same is hereby cancelled.
DENNIS, J., dissents with reasons.
TATE, J., is recused, having been a character witness in the federal trial.
DENNIS, Justice (dissenting).
I fully agree that disciplinary action must be taken against the respondent. I will even concede that perhaps he should be disbarred. However, I cannot approve the result of this proceeding, because in my opinion it was achieved without affording the respondent due process of law.
As the majority opinion correctly reflects, disciplinary proceedings were commenced against respondent because of his conviction in federal court of mail fraud and conspiracy to commit mail fraud. The principle crime is defined by 18 U.S.C. § 1341, as follows:
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."
In essence, the crime could involve a swindle of anything from a few cents to millions of dollars through use of the mails.
The main thrust of Shaheen's defense was that his degree of culpability was not sufficient to warrant disbarment, because he was only peripherally involved in a scheme perpetrated by others. The respondent attempted to prove this by offering testimony, affidavits and transcripts. But this evidence was given little, if any, regard by the Commissioner because he concluded that "the question of the degree of knowledge on the part of [Shaheen] is not properly at issue" and that no evidence which tended to disprove Shaheen's guilt of any aspect of the crimes of which he was convicted could be considered. The Commissioner stated that his decision in this regard was dictated by Article XV, § 8(7)(d) of the Louisiana State Bar Association Articles of Incorporation, which provides:
"(7) After the conviction has become final, that is, all appeals have been concluded or exhausted, the procedure shall be as follows:
"* * *
"(d) At the hearing based upon a respondent's conviction of a crime, the sole issue to be determined shall be whether the crime warrants discipline, and if so, the extent thereof. At the hearing the respondent may offer evidence only of mitigating circumstances not inconsistent with the essential elements of the crime for which he was convicted as determined by the statute defining the crime."
The majority opinion, as I understand it, has adopted the Commissioner's interpretation of the article.
I do not agree with this interpretation. Standing alone the last quoted sentence, of course, can be given such a construction. However, it would be at odds then with the preceding sentence, which sets forth the principal duty of this Court in this kind of disciplinary proceeding, and that is to determine "whether the crime warrants discipline, and if so, the extent thereof." Instead, I would construe the entire section to allow the respondent to introduce evidence, *1355 not to totally disprove his guilt, but in order to show that the degree of his culpability is not as great as that which might be inferred from the face of the judgment of conviction against him. It is conceivable that the circumstances under which an attorney has participated in the wrongful conduct of a client might be such that moral turpitude would be slight and yet the attorney might be guilty in fact and in law of a crime. Such a situation might justify less drastic action than permanent disbarment of the attorney. See, In re Tinkoff, 101 F.2d 341 (7th Cir. 1939). Cf. La. State Bar Association v. Ponder, 340 So.2d 134 (La.1976). (After considering evidence in mitigation of guilt the Court suspended an attorney for six months following his conviction of making false income tax returns). If we do not recognize this possibility and allow the consideration of evidence tending to prove it, I simply do not see how we can intelligently determine the extent to which an attorney's crime warrants discipline.
On the other hand, if the article of incorporation cannot be construed as suggested, I would have no recourse but to find the sentence barring introduction of evidence mitigating the degree of guilt unconstitutional as denying due process under both the federal and state constitutions.
The right to hold specific employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts of the Fifth Amendment to the United States Constitution, Greene v. McElroy, 260 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889); Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, 64 A.L.R.2d 288 (1957); Peters v. Hobby, 349 U.S. 331, 352, 75 S.Ct. 790, 99 L.Ed. 1129, 1144 (1955) (concurring opinion); cf. Slochower v. Board of Higher Education of City of New York, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915); Allgeyer v. Louisiana, 165 U.S. 578, 589, 590, 17 S.Ct. 427, 431, 41 L.Ed. 832, 835, 836 (1897); Powell v. Pennsylvania, 127 U.S. 678, 684, 8 S.Ct. 992, 995, 32 L.Ed. 253, 256 (1888). Moreover, the requirements of procedural due process must be met before a state can exclude a person from practicing law, including a full and fair hearing in which that person is given an opportunity to contest the bases of the recommendations against him. Willner v. Committee on Character & Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963). The Louisiana Constitution of 1974 grants each citizen equally broad protection of liberty in the pursuit of a profession as well as his right to due process and a fair hearing before any governmental restriction may be placed thereon:
La.Constitution Article I, § 2 provides:
"No person shall be deprived of life, liberty, or property, except by due process of law."
La.Constitution Article I, § 19 provides:
"No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. This right may be intelligently waived. The cost of transcribing the record shall be paid as provided by law."
In reaching the decision to disbar Philip Shaheen the Commissioner and this Court did not follow the requirements of the article of incorporation, as correctly interpreted, and certainly did not heed the precepts of our constitutional law. Insofar as I have determined, neither this Court nor the Commissioner has reviewed the record of the federal trial which led to the respondent's convictions, although this evidence was available to both. This record undoubtedly contains evidence relevant to the degree of his culpability in the form of testimony in his favor as well as cross-examination of the witnesses against him. Instead of reviewing this evidence, the Commissioner and the Court merely accepted as proven those facts stated in the Fifth Circuit Court of Appeals opinion. With all due respect to *1356 the able author of that opinion, there are several reasons it should not be used as a basis for our judgment of the extent of discipline warranted in this case. The author was not authorized by our constitution or laws to act as a finder of fact in Louisiana attorney disciplinary proceedings. His function in preparing the opinion was not that of a trier of fact, but that of a federal appellate judge assembling the evidence which would reasonably support the jury's verdict. In doing so, it may have been unavoidable for him to emphasize some of the most damning evidence against the respondent while properly considering it unnecessary to recite any mitigating evidence in his favor. An independent review of the record of respondent's trial by the Commissioner and this Court would have required some additional effort but not a retrial of the case as suggested by the Commissioner's report and the majority opinion. It seems that in order to afford a fair hearing or its equivalent this is the least that should have been done before stripping respondent of his right to practice law and thereby grievously injuring him, his wife, his five children, and his dependent mother. In concentrating their attention on the federal court of appeals opinion, and in refusing to consider the evidence offered by respondent to show that his involvement in the unlawful scheme was limited, the Commissioner and this Court have deprived respondent of liberty and property without due process of law and may have committed a grave injustice.
I respectfully dissent.
NOTES
[1] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. June 25, 1948, c. 645, 62 Stat. 701." 18 U.S.C., § 371.
[2] "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C., § 1341.