STATE of Minnesota, Respondent,

v.

Charles HERBST, Appellant.

No. C3–86–393.

Court of Appeals of Minnesota.

Nov. 4, 1986.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, Mark Thomason, Hubbard Co. Atty., Park Rapids, for respondent.

Mark L. Rodgers, Kief, Fuller, Baer, Wallner & Rodgers, Ltd., Bemidji, for appellant.

Heard, considered, and decided by FORSBERG, P.J., and FOLEY and LANSING, JJ.

## OPINION

FOLEY, Judge.

Charles Herbst appeals from his conviction of possession with intent to distribute a Schedule I controlled substance and contends the trial court erred in denying his motion to suppress evidence obtained in a search of his residence because a search warrant was both facially invalid and unsupported by probable cause; the warrant was improperly executed; and the identity of an anonymous informant was not disclosed. We reverse and remand for a new trial.

## FACTS

Appellant was charged with one count of possession with intent to distribute a Schedule I controlled substance. *See* Minn. Stat. §§ 152.02, subd. 2(3); 152.09, subd. 1(1); and 152.15, subd. 1(2) (1984). The charge was based upon evidence seized by agents of the Bureau of Criminal Apprehension and Hubbard County Sheriff's office in a search of appellant's rural Hubbard County residence.

Appellant came under the scrutiny of the BCA during a series of "controlled buys" of LSD from Victor Longrie. The agents hoped to identify Longrie's supplier and others in the chain of distribution by observing his movements before the buys. The agents recorded their observations in "resume statements" that were later filed with the trial court.

The first buy occurred on January 16, 1984. BCA special agent Douglas Partyka purchased 25 "dosage units" of LSD from Longrie for $100 in marked currency at Longrie's apartment in Grand Rapids, Minnesota. Partyka also told Longrie he was interested in purchasing greater amounts of LSD.

The second buy occurred on February 7, 1984 when Partyka gave Longrie $325 to obtain 100 units of LSD. Longrie told Partyka it would take four hours to drive to his source and return with the LSD. A surveillance team followed Longrie and another man to the Keg 'N Cork bar in Bemidji. BCA agent Terryl Jacobson went into the bar and saw Longrie sitting with John Reynolds. Reynolds talked with Kathy Rasmussen for a few minutes; she wrote some numbers on a newspaper and showed them to Reynolds. Reynolds and Longrie left the bar and returned in about an hour. Reynolds then talked with Rasmussen again. Longrie, Reynolds and Rasmussen went out to the parking lot and stood behind Reynolds' car. Rasmussen talked to an unidentified man next to a car registered to Bruce Tendrup. Jacobson followed Reynolds' car as it drove around Bemidji for about ten minutes, then returned to the parking lot. Rasmussen was in the Tendrup car when Reynolds' car returned. The group split up. Longrie drove back to Grand Rapids and delivered 100 units of LSD to Partyka.

The third buy took place on February 21, 1984 when Partyka purchased 500 units of LSD from Longrie for $1,050. Partyka met Longrie in Bemidji and gave him the money. Jacobson followed Longrie to the Keg 'N Cork, waited for 30 minutes and then went into the bar and saw Longrie sitting with Reynolds and two others. Reynolds made two trips to another table and talked with Ramussen. Rasmussen then left the bar, got into a car registered to appellant and drove off. Rasmussen returned after five to ten minutes and spoke to Reynolds; they both left the bar

and went into a nearby alley. BCA agent Gregory Hopps saw "something being passed" from Rasmussen to Reynolds before they went back into the bar. Longrie left the bar an hour later and gave Partyka the 500 units of LSD.

The fourth and final buy took place in Bemidji on the night of March 10, 1984. Partyka met with Longrie and gave him $1,850 for the purchase of 1000 units of LSD. Longrie went to the Keg 'N Cork and met Reynolds. The two men left the bar, got into Longrie's car and drove to a house at 1919 Delton Avenue. Reynolds got out of the car, went into the house and came out after about four minutes. Longrie picked him up and they went back to the bar. Reynolds left the bar with two other men and Longrie delivered 1000 units of LSD to Partyka.

Reynolds and Longrie were arrested on March 29, 1984 and questioned. Reynolds said Rasmussen was "not a big dealer" and that she "just got it for me from this other guy." Longrie signed a written statement and stated that he obtained LSD from Reynolds. Longrie thought Reynolds got it from "the female" but did not know her name. On the last buy, Longrie and Reynolds went to a house and got the drugs from a "female." When Reynolds came out of the house, he gave the LSD to Longrie. Longrie said the name "Kathy" was familiar but that he had never heard of "Charlie Herbst."

On the morning of April 2, 1984, Bemidji Police Sergeant Cleo Christopherson was called by an informant. At the omnibus hearing, Christopherson testified regarding that conversation:

> I was called on by an informant who told me that they knew Kathy Rasmussen very well and that she was highly involved in the drug scene and wanted to know why this person wasn't arrested with the rest of them that were arrested the night before. * * * that Kathy was selling and that she was getting her stuff from a fellow who had taught at the college and was thought to be a

professor and who lived in Hubbard County.

Christopherson said he had known the informant for 15 years and had worked with the informant "numerous times," the said informant was "most definitely" reliable and the information "was always correct." Defense counsel asked him about specific instances where he had used that informant:

> Oh, one time we used this person for someone—someone was selling alcohol without tax, resell, buy and reselling it and I have used this person for a number of times to find where people are at, how to find them.

When the prosecutor asked if the informant had ever supplied information "that has not been untruthful," Christopherson replied, "Never."

Jacobson prepared an "Application for Search Warrant and Supporting Affidavit" and a search warrant for appellant's property, which stated in relevant part:

> Affiant has good reason to believe, and does believe, that the following described property and things, to wit:
>
> As provided by MSA Chapter 152.09, subdiv. 1, controlled substances and associated paraphernalia, chemical precursors, moneys, products and equipment of any kind which are used or intended for use in violation of MSA 152; all records, research materials and related data which are used, or intended for use, in violation of MSA 152. Also identification and records, but not limited to these aforementioned, tending to establish residency or tending to establish constructive possession of certain items; as they might pertain to specific individuals.
>
> (are) * * * (at the premises) (in the motor vehicle) (on the person) described as: A two story home situate in the County of Hubbard and Township of Helga approximately two miles East of Hwy 71 on Hubbard County # 9, South on Hubbard # 36 approximately 1 mile South, to the second driveway on the left approximately ¼ mile driveway. Description being SE¼ of SW¼ Sec. 24 Helga Township.

Occupied by a person known as Charles Herbst.

located in the <u>Township</u> of <u>Helga</u>, County of <u>Hubbard</u>, and State of Minnesota.

\* \* \* \* \* \*

Facts tending to establish the foregoing grounds for issuance of a search warrant are as follows:

Your affiant is a special agent for the Minnesota Bureau of Criminal Apprehension; that on February 26, 1984, while on surveillance of a drug transaction between MN BCA S/A Partyka and Victor Longrie of Grand Rapids, MN, witnesses S/A Partyka meet Longrie in Grand Rapids, MN and S/A Partyka gave Longrie state confidential funds totaling $325.00 for Longrie to purchase approximately 100 doses units of LSD. Longrie left Grand Rapids and proceeded to the Keg and Cork bar located on Beltrami Ave. in Bemidji, Minnesota where he met an individual by the name of John Reynolds. After the meeting was over Reynolds through the evening made contacts to a person by the name of Kathy Rasmussen on the phone in the Keg and Cork. Rasmussen left the bar for approximately seven or eight minutes. During that time surveillance officers were unable to locate her whereabouts. She returned to the bar and talked to Reynolds at which time Rasmussen and Reynolds departed the bar to a 1968 Impala parked outside and stood by the trunk and appeared to have exchanged something. Rasmussen then went behind the bar and Reynolds and Longrie departed the area and proceeded back to Grand Rapids to meet S/A Partika who then purchased 100 units of LSD from Longrie. That your affiant on February 21, 1984, again was on a surveillance of such a transaction and that at approximately 8:04 p.m., Victor Longrie again met S/A Partyka at the Super Johns Warehouse parking lot at the South edge of Bemidji, Minnesota. A/S Partyka again gave Longrie state confidential funds this time totalling $1050.00, that was to be used for the purchase of approximately 500 units of LSD. Longrie again went to the Keg and Cork lounge in downtown Bemidji and again met John Reynolds. Reynolds in turn talked to Kathy Rasmussen on two occasions. After the second meeting Rasmussen left the bar and was followed by your affiant outside where Rasmussen called to a person by the name of "Chuck". They walked around the corner of the bar to a vehicle parked on 2nd St. in Bemidji, MN, a red Volkswagon Lic/DJE 138 which lists to a Charles Herbst, Rt. 1, Box 18, Guthrie, MN. They were in the car driving around approximately a three block area for about five minutes and returned to the Keg and Cork bar at which time Herbst dropped Kathy Rasmussen off and departed the area. Rasmussen went into the Keg and Cork and met immediately with Reynolds at which time they both left the bar and went to an alley located between the Keg and Cork bar and the Chief theatre where MN BCA S/A Hoppes witnessed an exchange of something between them. They went back to the bar following the exchange and Reynolds met with Longrie and after a short period of time Longrie returned to his vehicle and again met S/A Partyka and sold to S/A Partyka 500 tablets of LSD. A third meeting of these same individuals was done on March 10, 1984, when Longrie again sold LSD to S/A Partyka during this transaction Charles Herbst was seen in the area of the Keg and Cork. On March 29, 1984, Longrie and Reynolds were arrested for the sale of LSD, and on April 2, in the afternoon hours Kathy Rasmussen was arrested for aiding in the sale of LSD. During the morning hours of April 2, Sgt. Cleo Christopherson received a phone call from a citizen claiming that Kathy Rasmussen was the LSD source in Bemidji and this person wondered why she hadn't been arrested on the 29th when every one else was. This person further stated she believed Kathy Rasmussen's source for the LSD was a professor at the College who was making it. Your affiant knows Charles Herbst to have been a professor at the Bemidji

State University, and your affiant believed that the meeting between Rasmussen and Herbst on February 21, 1984, during the middle of an LSD transaction was not coincidental that the anonymous citizen called who is known by Sgt. Christopherson to be reliable was correct in judgment that Charles Herbst may posses at his home or personal belongings in Rural Guthrie the substance known as LSD contrary to the laws of the state of Minnesota.

Jacobson prepared the following search warrant:

**STATE OF MINNESOTA, COUNTY OF** Hubbard County **COURT TO:** S/A Jacobson, S/A Partyka, Hubbard County Deputies Ball, and Johannsen and all others under their control and direction **PEACE OFFICER(S) OF THE STATE OF MINNESOTA.**

**WHEREAS,** Terryl L. Jacobson has this day on oath, made application to the said Court applying for issuance of a search warrant to search the following described (premises) (motor vehicle) (person):

___

located in the Township of Helga, county of Hubbard STATE OF MINNESOTA for the following described property and things:

A two story home situate in the County of Hubbard and Township of Helga approximately two miles East of Hwy 71 on Hubbard County # 9, South on Hubbard # 36 approximately 1 mile south to the second driveway on the left approximately ¼ mile driveway. Description being SE¼ of SW¼ Sec. 24 Helga Township. Occupied by a person known as Charles Herbst.

Jacobson did not have the application and warrant reviewed by an attorney. A magistrate signed the search warrant, and it was executed by BCA agents and the Hubbard County Sheriff's office. They seized several items of evidence, including 500

dosage units of LSD and $1,820 in marked BCA funds.

At the omnibus hearing, appellant moved to suppress that evidence on the grounds that the search warrant was invalid, not supported by probable cause and improperly executed. He also moved for disclosure of the informant's identity. The trial court denied the motions, and appellant was subsequently found guilty after a court trial.[1] His sentence was stayed pending this appeal.

**ISSUE**

Was the search warrant valid?

**ANALYSIS**

The fourth amendment provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV; Minn. Const. art. I, § 10.

■ The search warrant issued for appellant's home did not contain a particular description of the things to be seized as required by both the fourth amendment to the United States Constitution and the Minnesota Constitution. In fact, the warrant did not describe the objects of the search whatsoever. We are compelled to conclude that this search warrant was unquestionably invalid on its face.

The application for the warrant does contain an adequate description. Courts in other jurisdictions have sometimes permitted such an affidavit to cure a defective search warrant. 2 W. LaFave, Search and Seizure, § 4.6(a) (1978 and Supp.1986). However, two requirements must be satisfied before an affidavit may be used to cure a deficient warrant:

1. Appellant's petition for discretionary review (C7-85-936) of the order denying his pretrial suppression motion was denied by this court's order of June 6, 1985.

[F]irst, the affidavit and search warrant must be physically connected so that they constitute one document; and second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of reference.

*Id.* (quoting *Bloom v. State*, 283 So.2d 134, 136 (Fla.App.1973)). Other courts have held that the executing officer must have at least had the affidavit with him, made reference to it during the search or served it with the warrant. *See id.* at 100 n. 23.

Here only photocopies were filed with the trial court, not the original warrant and application. The record contains no evidence which would support a finding that those two documents were ever physically connected. The search warrant does not incorporate the application by reference, nor is there any evidence that the several officers who executed the search warrant were in possession of the application. Finally, although Jacobson testified at the omnibus hearing that he read the search warrant to appellant and gave him a copy, the application was never mentioned. Under these circumstances, we hold that the State may not rely upon the application to cure the defective search warrant.

■ The State contends a "good faith" exception to the fourth amendment should apply under the facts of this case. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *see also Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). We note that the Minnesota Supreme Court has not adopted a "good faith" exception. *See State v. Wiley*, 366 N.W.2d 265, 269 n. 2 (Minn.1985); *see also State v. Doyle*, 336 N.W.2d 247, 252 (Minn.1983). We do not believe this is an appropriate case in which to make such a dramatic change in the interpretation of the Minnesota Constitution.

First, by definition the "good faith" exception cannot apply to a search warrant that is so obviously defective on its face. *See Leon*, 468 U.S. at 923, 104 S.Ct. at 3422. The "good faith" exception applies to search warrants that appear valid when executed but are later found to lack probable cause. *See Leon*, 468 U.S. at 905, 104 S.Ct. at 3412.

Second, the facts of this case distinguish it from the *Sheppard* decision. In *Sheppard*, the executing officer knew that the search warrant contained a defective description, but the magistrate assured the officer he had corrected the defect and that the warrant was valid. The Supreme Court held that the deterrent purposes of the exclusionary rule would not be furthered by punishing police officers for an error committed by a magistrate. *Sheppard*, 468 U.S. at 920, 104 S.Ct. at 3420.

Here the search warrant clearly lacked a basic element required by law, yet neither the executing officer nor the magistrate discovered that patent defect. We believe that the purposes of the exclusionary rule are furthered by suppressing evidence obtained pursuant to such a warrant. Law enforcement personnel must abide by the constitutional limitations on their ability to search private dwellings. The requirements of the fourth amendment to the United States Constitution and the Minnesota Constitution with respect to search warrants are not unduly burdensome. Where, as here, due care is not taken to meet those requirements, suppression is the appropriate remedy. We therefore hold that the trial court erred by not suppressing all evidence obtained pursuant to a search warrant which did not describe the things to be seized.

Appellant also contends the search warrant was unsupported by probable cause and improperly executed and that the trial court erred in denying his motion for disclosure of the informant's identity. Our decision in this case renders resolution of these issues unnecessary.

## DECISION

The order denying appellant's motion to suppress evidence obtained in a search of his residence and appellant's conviction are

reversed and the case remanded for a new trial in accordance with this opinion.

Reversed and remanded.