In the Matter of Arbitration between **MINNESOTA STATE PATROL TROOPERS ASSOCIATION on Behalf of Rodney PINCE, Petitioner, Appellant,**

v.

**STATE of Minnesota, DEPARTMENT OF PUBLIC SAFETY, et al., Respondents.**

No. C1–88–2292.

Court of Appeals of Minnesota.

March 28, 1989.
Review Denied May 24, 1989.

Frank Vogl, John P. Boyle, Best & Flanagan, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Alan C. Page, Sp. Asst. Atty. Gen., St. Paul, for respondents.

Heard, considered and decided by FORSBERG, P.J., and PARKER and SHORT, JJ.

## OPINION

PARKER, Judge.

The Minnesota State Patrol Troopers Association (Association) represented the grievant, Rodney Pince, in the appeal of his discharge from the Minnesota State Patrol (Patrol). After a hearing, the arbitrator held that the discharge was for just cause and supported by all the evidence. The Association filed an application to vacate the arbitration award in district court, which was denied. The Association now appeals the order confirming the arbitration award and denying its application to vacate. We affirm the arbitration award.

## FACTS

Rodney Pince was a state trooper for 17 years before he was fired in October 1987 for conduct injurious to the public welfare, willful violation of orders, and conduct unbecoming to an officer under Minn.Stat. § 299D.03, subd. 8(2) & (4) (1986). The discharge arose from numerous acts of

harassment against Pince's supervisor, Captain Charles Geiger, between November 1984 and May 1987.

In 1983, before the discharge at issue in this case, the Patrol placed Pince on involuntary sick leave for alleged psychological reasons arising largely out of conflicts with his supervisors. The Association successfully grieved the forced leave on Pince's behalf, resulting in his reinstatement. Geiger was not involved in Pince's forced leave, having been appointed captain of Pince's district during the leave. When Pince returned to work in August 1983, Geiger told him "that what was in the past is in the past" and that they "would start from square one." Geiger also mentioned that he felt things were going well in the district and between the troopers. Pince responded that he would reserve judgment on that for himself.

Beginning in November 1984, Geiger began receiving phone calls responding to newspaper advertisements for the sale of personal property. Several of the ads specified that calls not be placed until after 10:30 p.m. Geiger testified that he did not place the ads and that the newspapers told him that they had been paid for in cash.

In April 1986 a package was returned as undeliverable to Geiger's home, which was listed as the return address. The package contained a love letter and a pair of women's panties. The letter, which Geiger testified he did not write, caused considerable distress to Geiger and his family.

In September 1986 the post office stopped delivering mail to Geiger's residence. Upon inquiring, Geiger discovered that someone had forged his signature on a change of address card. In October Geiger began receiving copies of Playboy and Penthouse magazines in the mail. He had not ordered them and was informed that the subscriptions had been prepaid by money order.

When the harassment began, Geiger conducted an informal internal investigation and, after considering several possibilities, concluded that Trooper Rodney Pince was probably responsible. He took no disciplinary action at the time. When the letter with the panties arrived, Geiger consulted Minnesota State Patrol Deputy Chief Col. Glenn Gramse about the incident. Gramse sent the panties and fingerprints of Pince and another trooper to the Bureau of Criminal Apprehension (BCA) for analysis. Like the Patrol, the BCA is a subdivision of the Minnesota Department of Public Safety (DPS). Nothing definite was discovered. After the change of address card incident, the superintendent of the BCA assigned Agent Partyka to investigate the matter because he believed that a violation of the criminal forgery statute had possibly occurred.

On July 16, 1987, on the basis of an affidavit and after consulting the assistant St. Louis County attorney, Agent Partyka obtained a warrant to search Pince's residence. Partyka and two members of the Sheriff's Office conducted the search. Pince was driven to his home by another patrol officer and was present during the search. Pince told Partyka that he had hidden the typewriter identified in the warrant and that he had used it to type harassing ads before. He also directed the searchers to his garage, where they found additional evidence. Two officers testified that the statements were voluntary, not in response to any questions. When asked if the harassing acts he mentioned had been in reference to Geiger, Pince stated that he better wait until he talked with an attorney. The officers seized various materials, which were taken to the BCA for analysis.

The following day Pince was placed on investigatory suspension with pay, and on October 9, 1987, he was discharged from the Patrol. On October 29, 1987, the assistant St. Louis County attorney informed the Patrol by letter that his office would not criminally prosecute Pince for forgery. The county attorney indicated that although the forgery statute, Minn.Stat. § 609.63, subd. 1(6) (1986), could apply, he believed the provision "was intended to cover more public record-type of documents" and that it was unclear "that the statute was intended to include matters such as those presented in [Pince's] case." The county attorney also indicated that the

case was best handled civilly and administratively because it presented an "employment-related problem." The county attorney did state, however, that he felt the evidence was clear that Pince was responsible for the harassment.

Pince grieved his 1987 discharge, asserting that the Patrol had a longstanding vendetta against him because of his successful grievance in 1983. The parties participated in an arbitration hearing on March 18, 1988. Prior to the hearing, the Association made a motion in limine to suppress the evidence gathered by the BCA, alleging that the Patrol had improperly and unfairly initiated an unfounded criminal investigation to obtain otherwise unobtainable evidence in an attempt to drive Pince out of the Patrol. The arbitrator denied the motion and on May 27, 1988, issued a decision denying Pince's grievance. The arbitrator found that the record amply supported the conclusion that Pince is unfit to be a law enforcement officer.

By letter dated June 16, 1988, the Association requested that the arbitrator reconsider his decision. The arbitrator declined to do so. On August 22, 1988, the Association filed an application to vacate the arbitration award. The district court denied the application, sustaining the arbitrator's findings. It found that the Patrol did not violate the enabling legislation by having the BCA conduct an investigation of the allegations against Pince and that the evidence obtained was properly admissible at the arbitration hearing. The Association appeals this order.

### ISSUE

1. Did the arbitrator err in admitting evidence obtained through the BCA's search of Pince's home?

2. If the evidence obtained through the search of Pince's home is suppressed, does the remaining evidence support the arbitrator's decision?

### DISCUSSION

#### I

Arbitration proceedings in Minnesota are governed by Minn.Stat. § 572.08–.41 (1986).

Courts are extremely reluctant to set aside an arbitration award and will do so only under the conditions set forth in Minn.Stat. § 572.19 (1988). The section provides that even if the court would not or could not have granted the relief, this is not a ground for refusing to confirm the arbitrator's decision. Minn.Stat. § 572.19, subd. 1 (1988). The Minnesota Supreme Court stated its view of arbitration awards and the rationale behind them in *Cournoyer v. American Television & Radio Co.*, 249 Minn. 577, 83 N.W.2d 409 (1957):

> [A]n arbitrator, in the absence of any agreement limiting his authority, is the final judge of both law and fact, * * * and his award will not be reviewed or set aside for mistake of either law or fact in the absence of fraud, mistake in applying his own theory, misconduct, or other disregard of duty. An award will not be set aside merely because the court thinks the arbitrators erred either as to the law or the facts. If the rule were otherwise, arbitration proceedings, instead of facilitating the settlement of controversies, would serve but to delay the final determination of the rights of the parties.

*Id.* at 580, 83 N.W.2d at 411–12; *see also Grudem Brothers Co. v. Great Western Piping Corp.*, 297 Minn. 313, 316–17, 213 N.W.2d 920, 922–23 (1973).

This court is acutely aware of the broad scope of an arbitrator's authority, and we are reluctant to intrude upon it. The standard of review is less rigid with regard to constitutional issues, however. The fact that courts decline to interfere with the arbitration process does not confer upon the arbitrator the right to decide constitutional issues. *McGrath v. State*, 312 N.W.2d 438, 442 (Minn.1981). The court in *McGrath* provided that in the normal case, where the alleged constitutional violations are of a general nature, the arbitration is to proceed but the parties may raise the issue of constitutional violations at the time of judicial review of the arbitrator's decision. *Id.*

The Association claims that the search of Pince's homestead was unconstitutional

and that the evidence obtained pursuant to the search should have been suppressed under the fourth amendment. The Association asserts that the warrant was not based on sufficient probable cause and that the Patrol and the BCA abused their statutory authority in order to obtain otherwise unavailable evidence.

In grieving Pince's discharge from the Patrol, the Association correctly raised the issue of the constitutionality of the search in a pre-arbitration motion in limine. The arbitrator denied the motion and the parties proceeded to a hearing to determine whether the Patrol had just cause to discharge Pince. The arbitrator found that the evidence supported the discharge. Subsequently, the Association made an application to the district court to vacate the arbitration award, again raising the constitutional issues. The court denied the application, holding that the evidence was properly admitted pursuant to a legitimate search warrant. We disagree because we believe that the search was not supported by sufficient probable cause under Minn. Stat. § 626.08 (1986). We do not agree with the Association, however, that the BCA and the Patrol unconstitutionally abused their statutory authority in investigating Trooper Pince.

A. Statutory Authority for Search.

Minn.Stat. § 299C.03 (1986) provides that BCA personnel shall not be employed to render police services in connection with strikes and other industrial disputes. Because the county attorney referred to Pince's actions as being employment-related in his letter declining to criminally prosecute, the Association contends that the BCA investigation violated Minn.Stat. § 299C.03. We do not agree. The investigation was formally initiated by the superintendent of the BCA at the request of Patrol Deputy Chief Gramse when Geiger discovered the forged change of address card. Although clearly employment-related in that all of Pince's actions were directed toward his supervisor, the investigation itself centered on the possibility of criminal forgery. Forgery is a crime under Minn.

Stat. § 609.63 (1986), and the BCA has the authority to investigate crimes in this state. The fact that the investigation did not lead to criminal prosecution must not invalidate the investigation. Not every criminal investigation results in charges, but the investigating agencies still must have the authority to investigate all possibilities.

Captain Geiger and the Patrol had easier access to the expertise of the BCA than most employers instituting criminal investigations, because the Patrol and the BCA are both subdivisions of the Department of Public Safety. The Patrol merely requested assistance from the BCA; however, they could not and did not require the investigation. That decision came from the BCA itself after the forgery was discovered. Therefore, we do not agree with the Association's contention that the Patrol abused the BCA's power by using its criminal investigatory powers in the investigation of Pince.

B. Presence of Probable Cause.

The district court held the search warrant supported by probable cause and the property seized pursuant to the search properly considered by the arbitrator. It further stated that "[w]hether there was probable cause * * * is irrelevant and immaterial in this civil action which is a labor arbitration proceeding on review to this Court." We do not agree. We believe that the affidavit lacked sufficient probable cause to justify a search warrant and that evidence seized pursuant to an unconstitutional search cannot be admitted in an arbitration proceeding involving an employee's discharge.

The affidavit upon which the search warrant was based in this case did not meet the statutory requirements for the issuance of a warrant. To issue a search warrant, a court must find probable cause, supported by an affidavit naming or describing the person and particularly describing the place to be searched and the property to be seized. Minn.Stat. § 626.08 (1986). A court may issue a search warrant upon a showing that the property to

be seized was used to commit a crime or tends to show that a crime has been committed or that a particular person has committed a crime. *See* Minn.Stat. § 626.07(2) & (5) (1986). The application and accompanying affidavit unaccountably failed to mention the forgery of the postal change of address card, which was the only chargeable criminal offense.[1] While the affidavit describes in detail the other harassment Geiger endured, none of those acts appears to constitute a crime.

Moreover, the affidavit fails effectively to link Pince to any crime. Pince is mentioned only in reference to his conversation with Captain Geiger upon returning to the Patrol. While this conversation could be interpreted as indicating ill will on Pince's part toward Geiger, it does not provide sufficient evidence that Pince in fact committed forgery or even that he committed the harassment described.

The lack of any reference to a crime and the failure to link Pince to the commission of a crime are fatal shortcomings to the affidavit. Therefore, we hold that the warrant was defective because of insufficient probable cause.

 Evidence seized on a defective search warrant must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). While the United States Supreme Court in *United States v. Leon,* 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984), held that evidence seized on a defective search warrant may still be admissible if the law enforcement officers acted in good faith, Minnesota has not yet adopted a good-faith exception. *See State v. Wiley,* 366 N.W.2d 265, 269, n. 2 (Minn.1985); *State v. Doyle,* 336 N.W.2d 247, 252 (Minn.1983). In the absence of supreme court adoption of the exception, this court has specifically declined to "make such a dramatic change in the interpretation of the Minnesota Constitution."

*State v. Herbst,* 395 N.W.2d 399, 404 (Minn.Ct.App.1986); *see also State v. Gabbert,* 411 N.W.2d 209, 214 (Minn.Ct.App. 1987). We again decline to adopt a good-faith exception, as we believe it is not the province of this court to do so. Furthermore, the facts of this case do not support its application.

 Because we find that the search warrant lacked probable cause and we decline to adopt a good-faith exception, we hold that the evidence seized in the search should have been suppressed at the arbitration hearing. The primary purpose, if not the sole purpose, of the exclusionary rule is to deter future unlawful police conduct. *United States v. Janis,* 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976). To give effect to this deterrence function, we cannot allow one government agency to use the fruits of unlawful conduct by another branch of the same agency to obtain an employee's dismissal. Furthermore, the loss of a job is a very severe sanction which warrants special consideration. We agree with Judge J. Skelly Wright of the Court of Appeals for the District of Columbia, who wrote:

> It would seem wholly at odds with our traditions to allow the admission of evidence illegally seized by Government agents in discharge proceedings, which the Court has analogized to proceedings that "involve the imposition of criminal sanctions * * *."

*Powell v. Zuckert,* 366 F.2d 634, 640 (D.C. Cir.1966) (quoting *Peters v. Hobby,* 349 U.S. 331, 344, 75 S.Ct. 790, 796–97, 99 L.Ed. 1129 (1955)).

We disagree with the district court's holding on the admissibility of the illegally seized evidence and hold that the exclusionary rule applies to labor arbitration proceedings involving the possible loss of a job. While we understand the broad scope of authority given to arbitrators to deter-

---

1. Minn.Stat. § 609.63, subd. 1(6) (1986), provides that a person is guilty of forgery if he intentionally

 without authority of law, destroys, mutilates, or by alteration, false entry, or omission, falsifies any record, account, or other document

 relating to a person, corporation, or business, or filed in the office of, or deposited with, any public office or officer * * *.

 Forging a party's name on a postal change of address card constitutes the alteration of a public record.

mine admissibility of evidence, we believe that if evidence is unconstitutionally seized, it cannot be used for any purpose.

## II

The issue then becomes whether, absent the evidence that must be suppressed as the product of an illegal search and seizure, sufficient evidence remains to warrant the arbitrator's affirmance of Pince's discharge. During the illegal search the officers seized a typewriter, photocopies of newspaper ads, notes and other typewritten materials. These materials were inadmissible and should have been suppressed. Sufficient other evidence was presented, however, to support Pince's discharge.

 The Association argues that the incriminating statements Pince made during the search must also be excluded. Much of the Association's argument focuses on its assertion that the lack of a *Miranda* warning resulted in a fifth amendment violation. We do not agree. Inasmuch as the proceeding at issue in this case is not criminal, it was not necessary to give Pince a *Miranda* warning in order to use the statements in a civil labor arbitration proceeding. Furthermore, an arbitrator's judgment on the application of *Miranda* is a ruling on the admissibility of evidence which must be upheld. *See American Postal Workers v. United States Postal Service,* 789 F.2d 1, 3 (D.C.Cir.1986).

 Even if strict criminal standards were to apply to this arbitration, however, the statements would be admissible under the fifth amendment. When an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way, procedural safeguards must be employed to protect that person's privilege against self-incrimination. *Miranda. v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966). Custodial arrest in the *Miranda* context conveys to the suspect a message that he has no choice but to submit to the officers' will and to confess. *Minnesota v. Murphy,* 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984). It thrusts an individual into an unfamiliar atmosphere created for no purpose other than to subject the individual to the will of the interrogator. *Id.* In *Murphy* the Supreme Court held that a probationer who was required to meet with his probation officer was not "in custody." Therefore, no *Miranda* warning was required to protect his privilege against self-incrimination. The Court stated that the probationer's "regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the privilege." *Id.*

Any statement given freely and voluntarily, without any compelling influences, is admissible. *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966). *Miranda* safeguards come into play when the person in custody is subjected either to express questioning or its functional equivalent. *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The Court explained "functional equivalent" as

> any words or actions on the part of the police * * * that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Id.* at 300–301, 100 S.Ct. at 1689–90.

We do not believe that the search of Pince's home created a custodial environment or that the searching officers' actions subjected Pince to express questioning or its "functional equivalent." Like the probationer in *Murphy,* Pince was required to be present during the search. He was driven to his home by another trooper at his supervisor's request. The searching officers specifically told Pince upon arrival, however, that he was not under arrest. Two of the searching officers testified that Pince made his statements voluntarily; they were not in response to any questioning.

 The Association also claims that the statements should be excluded as evi-

dence obtained pursuant to a search illegal under the fourth amendment. Unlike the constitutionality of the search issue, we cannot conclude on this record that the statements Pince made were or were not "fruits of the poisonous tree" as a matter of law; thus, a fact question remains on whether the statements were solely attributable to the compelling influence of the subpoena. Consequently, the arbitrator was free to admit the statements under his broad authority to determine the admissibility of evidence. *See, e.g., American Postal Workers v. United States Postal Service,* 789 F.2d 1, 3 (D.C.Cir.1986) (court had no choice but to uphold and enforce arbitrator's award regardless of whether the arbitrator was correct on application of *Miranda* ); *Amalgamated Meat Cutters & Butcher Workmen of North America, District Local No. 540 v. Neuhoff Brothers Packers, Inc.,* 481 F.2d 817, 820 (5th Cir. 1973) (viewed as a question of evidence, the arbitrator has great flexibility and the courts should not review the legal adequacy of his evidentiary rulings). Because we believe that the statements were properly before the arbitrator, we cannot order the statements suppressed, for to do so would be to usurp the function of the arbitrator.

In addition to the incriminating statements which tend to link Pince to the harassment, the arbitrator had before him abundant additional support for his decision. Geiger himself collected the love letter with its enclosure, the forged change of address card, and typewritten subscription forms and letters from the newspapers and magazines. He sent this evidence to the BCA for analysis along with other samples of typewritten material from Pince's file. The BCA lab analyst testified there was a 95 percent probability that the typewritten evidence of the harassment came from the same typewriter as the documents in Pince's file. The Patrol also offered a signed statement from a radio repair person stating that he overheard a fellow employee say to Pince, "that's better than sending him Penthouse." Because of the nature of the arbitration process, this evidence is perfectly admissible.

The arbitrator also properly considered Pince's remark to Geiger in 1984 when he returned to work from the forced leave. The remark appears to indicate some resentment. Finally, we consider it significant that Pince chose not to testify at the arbitration hearing. While the choice not to testify would be inadmissible in a criminal proceeding, it may be considered in a civil proceeding such as this labor arbitration hearing.

Because we find ample support in the record for Pince's discharge from the Patrol, we affirm the trial court on that basis and because of the severe limitation on our authority imposed by statute. Minn.Stat. § 572.19, subd. 1 (1988), provides that an arbitration award may be vacated if the award was procured by corruption, fraud or other undue means; if there was evident partiality, corruption or misconduct by the arbitrator; if the arbitrator exceeded his power; if the arbitrator conducted the hearing in a manner prejudicial to a party; or if no arbitration agreement existed. The statute continues:

> But the fact that the relief was such that it *could not* or would not *be granted by a court of law* or equity is not ground for vacating or refusing to confirm the award.

Minn.Stat. § 572.19, subd. 1 (1988) (emphasis supplied).

Our power to vacate the arbitration award is strictly limited to the grounds listed in the statute. While we believe that the arbitrator should not have considered the evidence obtained through the illegal search, we find no grounds to vacate the award. The only statutory reference to evidence among the grounds for vacating an award is if the arbitrator "refused to hear evidence material to the controversy." Minn.Stat. § 572.19, subd. 1(4) (1988). That is not the case here; if anything, the arbitrator heard too much evidence. Moreover, the record reflects no evidence of corruption, fraud, partiality or misconduct by the arbitrator. He decided this arbitration within his statutory authority, and his decision must be affirmed.

## DECISION

Affirmed.

FORSBERG, Judge (concurring specially):

I concur in the decision of the majority, but have some reservations about certain aspects of the opinion.

I do not believe that the exclusionary rule which is already in decline in criminal law should be extended to civil cases even though some deterrence in specific cases may be present.

Moreover, even if the exclusionary rule is extended to civil cases, the evidence in this case would clearly be admitted under the "good faith" exception to the fourth amendment exclusionary rule.

Curiously, the majority bases its decision on the incriminating statements of Rodney Pince which, if the exclusionary rule applies in this case, would clearly be excludable as fruits of the poisoned tree.