In the Matter of the Arbitration Between: The COUNTY OF HENNEPIN, Petitioner, Appellant,

v.

LAW ENFORCEMENT LABOR SERVICES, INC., LOCAL # 19, Respondent.

No. C4–93–1412.

Supreme Court of Minnesota.

Feb. 17, 1995.

Michael O. Freeman, Hennepin County Atty., Martin D. Munic, Asst. County Atty., Minneapolis, for appellant.

Marylee Abrams, Executive Director/Atty., Law Enforcement Labor Services, Inc., Bloomington, for respondent.

## OPINION

TOMLJANOVICH, Justice.

On July 29, 1991, at approximately 11:30 p.m., Hennepin County Deputy Sheriff Brian Fragodt and Officer Paul Schutte, of the Corcoran Police Department, responded to a prowler call. No prowlers were found at the scene, but the officers located two 13-year-old boys approximately one half mile away. The boys admitted they were outside the home in question, and were driven by the officers to the home of Gregory and Deborah Franzen, parents of one of the boys.

Later that same evening, at 1:51 a.m., another prowler call was made by the same household. Fragodt responded with Hennepin County Deputy Sheriff Curt Roberts. Although no prowlers were found at the scene, Fragodt suspected the two boys had returned to the residence. While driving toward the Franzen home, Fragodt instructed a dispatcher to call the Franzen house. The dispatcher's call reached an answering machine.

When the deputies reached the Franzen home, they found it dark, with several cars parked outside, one with a warm engine. After knocking on the front porch door, the deputies noticed the porch door was unlocked and the interior French glass doors were open. At that time, the temperature was approximately 60 degrees outside. The deputies then walked into the attached porch and knocked on the open French doors. They announced their presence loudly as the Hennepin County Sheriff's Department. Getting no response, they yelled the same message two or three additional times. Still receiving no response, they took two or three steps into the kitchen, yelled again, and received no response. After repeated announcements with no response, the deputies proceeded upstairs where they encountered Mr. and Mrs. Franzen.

The deputies explained there had been an earlier prowler complaint and that the Franzen's son had admitted to being near the complaining home. The deputies further explained they thought the Franzen boy might have been out again near the same house and they had come to the Franzen's home with the intention of talking with him. After seeing the open door, they claim they decided to check and see if everything was all right. With the Franzens' consent, the deputies confirmed the Franzen boy was at home asleep and his shoes were not damp. After apologizing for the inconvenience, the deputies left.

The Franzens filed a complaint with the Sheriff's department and an internal investigation ensued resulting in the Sheriff suspending the deputies without pay for violating the Fourth Amendment and consequently

the department rules and regulations.[1] The deputies' union, respondent, Law Enforcement Labor Services, Inc., Local No. 19, appealed the Sheriff's decision and demanded binding arbitration pursuant to a collective bargaining agreement. The parties submitted the following issue to the arbitrator:

Was the discipline received by deputies Fragodt and Roberts for just cause as required by Article XXXIV?

The arbitrator determined: "the deputies had exigent circumstances to enter the Franzen house. There was no violation of the Franzen's Fourth Amendment rights, nor any Sheriff's Department Manual of Rules and Regulations." Thus, "[the sheriff] clearly did not have just cause to discipline the deputies."

Appellant, Hennepin County, sought to vacate the arbitration award on the grounds that the arbitrator exceeded his authority by ruling on an issue of constitutional law, and that if not vacated, the arbitrator's erroneous Fourth Amendment determination would have a deleterious effect on the Sheriff's ability to perform his duties. The trial court denied the County's motion to vacate and the court of appeals affirmed the trial court's judgment. On appeal to this court, the County contends the arbitrator exceeded his authority by deciding a constitutional issue. We agree and reverse the judgment of the court of appeals. Because we reverse on the basis that the arbitrator exceeded his authority, we decline to address appellant's additional arguments for reversal.

■ A reviewing court must independently determine the scope of the arbitrator's authority de novo. *Minnesota Educ. Ass'n v. Independent Sch. Dist. No. 495*, 290 N.W.2d 627, 629 (Minn.1980); *State v. Berthiaume*, 259 N.W.2d 904, 909 (Minn.1977). The burden of establishing the arbitrator exceeded his authority is on the party challenging the arbitrator's award. *Hilltop Constr., Inc. v. Lou Park Apartments*, 324 N.W.2d 236, 239 (Minn.1982). *Id.*

■ The scope of an arbitrator's authority is a matter of contract interpretation to be determined from a reading of the parties' arbitration agreement. *Ramsey County v. AFSCME, Local 8*, 309 N.W.2d 785, 789–90 (Minn.1981). An arbitration award will be set aside only when the objecting party establishes that the arbitrators have clearly exceeded the powers granted to them in the arbitration agreement. *Id.* A court shall not overturn an award merely because it disagrees with the arbitrator's decision on the merits. *Id.; see also, United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (stating "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice").

■ While not disputing the well settled rules used to determine the scope of an arbitrator's authority, appellant argues Minnesota law is clear: an arbitrator lacks the authority to decide constitutional issues. We agree that in the public sector an arbitrator lacks the authority to decide constitutional issues.

We first indicated an arbitrator "does not have the authority to make determinations concerning the constitution" in *City of Richfield v. Local No. 1215, International Ass'n of Fire Fighters*, 276 N.W.2d 42, 51 (Minn. 1979). Two years later, in 1981, we again addressed the arbitrability of a constitutional issue in *McGrath v. State*, 312 N.W.2d 438 (Minn.1981). In *McGrath*, prison guards were disciplined for abuse of sick leave. The guards filed a grievance as to the discipline and simultaneously commenced litigation in district court alleging their constitutional rights were violated by the internal investigation that led to their suspension. The trial court concluded all of the allegations in the guards' complaint came within the collective bargaining agreement, and therefore, they should first exhaust the grievance procedure before commencing litigation in the courts.

On appeal to this court, the guards contended the arbitration should have been stayed pending the result of the district

---

1. The Sheriff's department rules and regulations essentially provide that if a deputy violates a law, she in turn violates a departmental rule or regulation.

court's constitutional determination. *Id.* at 441. We rejected the guards' argument, and instead adopted the administrative law rule that requires a party to exhaust its contract remedies prior to litigation unless a clear and unambiguous violation of the complaining party's constitutional rights is alleged. *Id.* at 441 (citing *E. I. DuPont de Nemours & Co. v. F.T.C.*, 488 F.Supp. 747, 753 (D.Del.1980)). We determined the guards alleged no action that "clearly and unambiguously" violated their constitutional rights and concluded:

> The fact that we decline to interfere with the arbitration process does not confer upon the arbitrator the right to decide constitutional issues. We have already indicated that arbitrators are without such authority in Minnesota. *See City of Richfield v. Local No. 1215, Etc.*, 276 N.W.2d 42, 51 (Minn.1979). We now expressly hold this to be the rule in Minnesota irrespective of the language of the arbitration agreement. In the normal case, where the constitutional violations alleged are of a general nature, the arbitrator is to proceed. The alleged constitutional violations may be raised at the time of judicial review of the arbitration determination.

*Id.* at 442.

■ *McGrath* essentially centers on the issue of ripeness. If the constitutional claim is clear and unambiguous, a party may present the constitutional issues to a court immediately. However, if the constitutional claim is of a general nature, then the party must wait until after the grievance proceeding is exhausted to commence litigation. The *McGrath* decision further states, in unequivocal language, that in neither case may an arbitrator decide a constitutional issue.

■ We reaffirm our holdings in *City of Richfield* and *McGrath* and again hold that in the public sector an arbitrator has no authority to make constitutional determinations, irrespective of the language of the arbitration agreement. Moreover, neither the holdings in *City of Richfield, McGrath,* nor this case suggest that a reviewing court should "review an arbitrator's decision for constitutional error" *New Creative Enter. v. Dick Hume & Assoc.*, 494 N.W.2d 508, 511 (Minn.App.1993) under a "less rigid" standard of review. *Minnesota State Patrol Troopers Ass'n v. State*, 437 N.W.2d 670, 674 (Minn.App.1989). A constitutional determination, like any other determination made by an arbitrator, is not reviewed for error under a less rigid standard, but rather is only reviewable on the basis that the arbitrator exceeded his authority. *See City of Bloomington v. Local 2828, AFSCME*, 290 N.W.2d 598, 602 (Minn.1980) ("The proper role of judicial review in arbitration cases is solely to determine whether specific language in the agreement or submission precludes the arbitrator from deciding the case as he did.").

■ In the present case, therefore, in accordance with *Richfield* and *McGrath*, we hold the arbitrator erred in making the Fourth Amendment determination. The issue should have been brought to the district court for determination. Although it was not brought to the trial court immediately, because the trial court and court of appeals have reviewed the validity of the deputies' warrantless entry, this court may now review this determination.

■ Under the Fourth Amendment to the United States Constitution and Art. I, § 10 of the Minnesota Constitution, "[w]arrantless entries and searches inside one's home are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). *Accord State v. Lohnes*, 344 N.W.2d 605, 610 (Minn.1984). Courts have recognized an exception to the warrant requirement if exigent circumstances exist. However, this court has held that "the expectation of privacy that one has in one's residence is the core expectation or interest protected by the Fourth Amendment and we are and will be hesitant in finding exigent circumstances for warrantless entries of dwellings." *State v. Storvick*, 428 N.W.2d 55, 61 (Minn.1988). Exigent circumstances justifying a warrantless entry into a private residence include such things as: hot pursuit of a fleeing felon, imminent destruction of evidence, preventing a suspect's escape, and the emergency exception. *Lohnes*, 344 N.W.2d at 610; *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990).

In this case, the trial court cited the emergency exception to support its determination that the officers had not violated the Fourth Amendment. Under the emergency exception the police may enter a home without a warrant if they reasonably believe that a person within is in need of immediate aid. *See e.g., State v. Othoudt,* 482 N.W.2d 218, 223 (Minn.1992); *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). An objective standard is used to determine whether an officer reasonably believed an emergency existed. *Othoudt,* 482 N.W.2d at 223. The focus of the inquiry is whether the facts available to the officer at the moment she entered the home would lead a person of reasonable caution to believe that someone inside the home needed emergency assistance. *Id.*

In *State v. Anderson,* 388 N.W.2d 784 (Minn.App.1986), a dispatch in response to a call from the mother of a likely victim, told two officers to go immediately to the site of a domestic dispute. *Id.* at 785. The officers were informed that a man was "throwing people around and had grabbed a little girl." *Id.* Upon arriving at the home, the officers saw through a front window "that several lights were on and that the front room was strewn with papers, clothing and toys." *Id.* Based on these facts, the court held that the officers reasonably believed persons inside the home were in need of immediate assistance, and thus their warrantless entry was justified. *Id.* at 787.

In *State v. Halla–Poe,* 468 N.W.2d 570 (Minn.App.1991), after observing a woman driving erratically and hitting the median several times, a good samaritan, stopped to help the seemingly intoxicated woman after she stopped her car in a busy thoroughfare. *Id.* at 571–72. The good samaritan observed the woman smelled of alcohol and was unable to walk or talk and helped the woman from her car to his. *Id.* at 572. After driving the woman to her apartment, the good samaritan and a neighbor called the police because they were worried about her condition. *Id.* When the officers arrived, the good samaritan and the neighbor described the woman's condition and the preceding events. *Id.* The court upheld the officers' warrantless

entry into the woman's apartment, since the officers reasonably believed the woman was in need of immediate aid. *Id.* at 573.

In contrast, in *United States v. Selberg,* 630 F.2d 1292 (8th Cir.1980), due to thefts and vandalism that had occurred on several occasions, Mr. Selberg asked a neighbor to watch his home for suspicious activity. *Id.* at 1293. After observing Selberg leave his home one day, the neighbor later noticed that Selberg's front door, which was behind a storm door, was open. *Id.* at 1294. The neighbor called the police, and when the officer arrived told the officer he was concerned about a burglary. *Id.* The officer, who was aware of the thefts and vandalism in the area, knocked on the storm door several times, but received no answer. *Id.* He then entered through the unlocked storm door and the open front door without a warrant. *Id.* The Eighth Circuit determined the officer's "initial warrantless entry * * * was carried out under circumstances which did not objectively demonstrate any emergency threat to persons or property." *Id.* at 1296.

The deputies based their warrantless entry into the Franzen home on the following facts: 1) one unresolved prowler call had occurred, 2) a telephone call made shortly before the deputies arrived was answered by a machine, not a person, 3) the house was dark, 4) one of several cars in the driveway was warm, 5) the temperature was about 60 degrees, the porch door was unlocked, and the interior French doors were open, and 6) no one responded to their shouts and knocks.

In this case, the facts the deputies had before them pale in comparison to the circumstances in those rare cases where the emergency exception does justify a warrantless entry into a home. Accordingly, we hold the circumstances preceding the deputies' warrantless entry into the Franzen's home did not objectively demonstrate a person inside the home was in need of immediate assistance; thus, exigent circumstances did not justify a warrantless search and the deputies violated the Fourth Amendment.

Reversed and remanded to the arbitrator for a determination, in accordance with this

decision, of whether the sheriff's department had "just cause" to discipline the deputies.