**BASS ENERGY, INC., Appellee and Cross-Appellant,**

v.

**CITY OF HIGHLAND HEIGHTS, Appellant and Cross-Appellee.**

[Cite as *Bass Energy Inc. v. Highland Hts.*, 193 Ohio App.3d 725, 2010-Ohio-2102.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 93698.

Decided May 13, 2010.

Buckingham, Doolittle & Burroughs, L.L.P., William D. Dowling, and Matthew R. Duncan, for appellee and cross-appellant.

Reminger & Reminger Co., L.P.A., Todd M. Jackett, and John P. O'Neil, for appellant and cross-appellee.

---

MELODY J. STEWART, Judge.

{¶ 1} Defendant-appellant and cross-appellee, city of Highland Heights, appeals from a preliminary injunction that declared a city resolution unconstitutional because the resolution substantially impaired a lease the city held with plaintiff-appellee and cross-appellant, Bass Energy, Inc. The court revived the lease and held that Bass Energy could invoke its right of arbitration under the lease. The city maintains that the court erred by finding that the resolution impaired the lease and further erred by finding that Bass Energy did not waive its contractual right to arbitration. Bass Energy cross-appeals on grounds that the court's findings of fact interpreted lease terms that were subject to arbitration. We affirm the court's conclusions, holding that the resolution impaired the lease and that Bass Energy did not waive the right to demand arbitration.

I

{¶ 2} The city passed Resolution No. 63–2006 in January 2007. This resolution authorized the mayor to enter into two leases with Bass Energy for the installation and maintenance of natural gas wells at three sites within the city: two of the sites were located in a city park; the third site was located at the city

hall complex. The resolution stated that it was "contingent upon the approval of the three sites by the City of Highland Heights and the commitment of Bass Energy to drill the wells on all three sites."

{¶ 3} In March 2007, the parties entered into a minimum three-year lease covering two sites within the park property. The lease gave Bass Energy the right to enter onto the sites for the purpose of drilling, operating, and removing oil, gas, and all related constituents. The lease provided that it would become null and void in the event a well was not commenced on the premises within six months, provided Bass Energy made a "delay rental payment" to the city. The wells did not commence within the stated time frame, but Bass Energy made two delayed rental payments in March 2007 and March 2008, respectively. The city cashed both checks.

{¶ 4} The lease also required Bass Energy to submit to the city, prior to drilling, a plat showing the location of the well, pipelines, and appurtenant equipment, along with the portion of the city property to be included in the drilling unit. The lease stated: "[Bass Energy] shall receive written approval from the [city] of the location of the well * * * prior to commencing drilling operations." With the assistance of the city engineer, Bass Energy drew up plans containing specific locations of well heads. Bass Energy applied for and obtained a permit from the Ohio Department of Natural Resources to operate oil and gas wells at the park site.

{¶ 5} Before any drilling could commence, however, the city reversed its position on drilling at the park property. It passed Resolution No. 8–2008, which rescinded Resolution No. 63–2006 due to "serious concerns that the gas wells may cause safety and health issues to its residents." The resolution also noted that the city had not approved the three sites in writing, nor had three suitable sites been found. In a letter to Bass Energy, the city's law director stated that "recent reports of gas/oil well explosions in other areas and the proximity of the proposed well-heads to residential neighborhoods" caused the city to rescind the lease authority "in furtherance of the general welfare."

{¶ 6} Bass Energy filed a complaint for breach of contract and sought a declaration of its rights under the lease. It also requested a preliminary injunction barring the city from rescinding the leases, claiming that Resolution No. 8–2008 impaired its contract with the city and that it had expended considerable sums in seeking permits for drilling and preparing the subject site. It asked the court to stay the proceedings and refer the matter to arbitration as provided by the lease.

{¶ 7} The city opposed the motion for a preliminary injunction by arguing that the lease was a contingent contract that required the city's written approval for the location of the wells and that Resolution No. 8–2008 constituted notice to Bass

Energy that "suitable sites have not been found." The city also opposed the request to stay the matter and refer it to arbitration because it claimed that Bass Energy waived the right to arbitration by waiting seven months from the adoption of Resolution No. 8–2008 to make its demand.

{¶ 8} The court issued a written opinion finding that the parties had entered into a valid contract despite the city having failed to issue written approval of the well sites within the park. The court then found that the adoption of Resolution No. 8–2008 substantially impaired the contract because it denied Bass Energy "the reasonable expectation that the parties would look for well locations for three years." The court also found that Bass Energy did not waive the right to arbitrate because the city's action to rescind the lease left Bass Energy with no option other than to enforce the lease by suit. The court granted the preliminary injunction in part, held that Resolution No. 8–2008 was invalid, and ordered the parties to "continue to look for three well locations as required by the contract." The court also stated that "[a]ny alleged breach of contract may be submitted to arbitration as required by the Lease."

## II

{¶ 9} The city's first assignment of error is that the court erred by finding that Resolution No. 8–2008 unconstitutionally infringed upon the lease between the parties. This assignment requires, at bottom, a determination of whether a valid contract existed. The city maintains that the lease agreement was contingent upon its written approval of well locations—approval that it did not give as shown by Resolution No. 8–2008.

## A

{¶ 10} Both Section 28, Article II of the Ohio Constitution and Section 10, Article I of the United States Constitution forbid the passage of state laws "impairing the obligation of contracts." The Ohio Supreme Court has interpreted Section 28, Article II of the Ohio Constitution by reference to United States Supreme Court precedent, see *Middletown v. Ferguson* (1986), 25 Ohio St.3d 71, 77, 25 OBR 125, 495 N.E.2d 380, so we do the same.

{¶ 11} The Contract Clause is not an absolute prohibition and does not prevent a state from exercising its police powers to promote the general welfare, even though private contracts between individuals might be adversely affected. See *Allied Structural Steel Co. v. Spannaus* (1978), 438 U.S. 234, 241, 98 S.Ct. 2716, 57 L.Ed.2d 727; *United States Trust Co. v. New Jersey* (1977), 431 U.S. 1, 21, 97 S.Ct. 1505, 52 L.Ed.2d 92. To determine whether a state law violates the Contract Clause, the first step is to determine whether the law has "operated as a

substantial impairment of a contractual relationship."  Id. at 244, 98 S.Ct. 2716, 57 L.Ed.2d 727.  This analysis may be further broken down into three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Gen. Motors Corp. v. Romein* (1992), 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328.

B

{¶ 12} The city does not dispute the court's factual finding that the parties entered into a contractual relationship, nor does it dispute that Resolution No. 8–2008 rescinded the lease.

{¶ 13} The city does dispute, however, that the passage of Resolution No. 8–2008 impaired the contractual relationship.  It maintains that the lease was contingent upon the city's written approval of the locations of the three gas well sites and that, by not giving written approval for any gas well sites, the contract could not be fully performed;  therefore, the passage of Resolution No. 8–2008 could not have substantially impaired a contractual right of Bass Energy.

{¶ 14} The United States Supreme Court has not provided definitive guidance on what constitutes "substantial" contract impairment, but it has held that total destruction of a contract is obviously a substantial impairment.  *Home Bldg. & Loan Assn. v. Blaisdell* (1934), 290 U.S. 398, 431, 54 S.Ct. 231, 78 L.Ed. 413. Resolution No. 8–2008 "rescinded" Resolution No. 63–2006, which "authorized and directed" the mayor to enter into "two (2) leases with Bass Energy, Inc., for the installation, maintenance and service of the gas wells."  There is no dispute that the mayor entered into a lease agreement with Bass Energy, so the city's action to rescind the lease in effect deprived the mayor of that initial approval to enter into the contract.  By any reckoning, this was a total destruction of the lease.

{¶ 15} In reaching this conclusion, we reject the city's argument that its right to reject proposed drilling sites (it had to give advance written approval of the sites prior to commencement of drilling) made the lease contingent.  The city may have had the right to reject proposed drilling sites, but Bass Energy had the right during the term of the lease to continue to search for and locate sites that could be suitable to the city.  By rescinding the lease, the city essentially told Bass Energy that it would not approve any site for drilling, thus totally destroying the object of the lease.  The city stated the object of the lease in a whereas clause to Resolution No. 63–2006: "Bass Energy, Inc. will install, as well as provide maintenance and service for, the gas wells for the City of Highland Heights."  The parties plainly contemplated that Bass Energy would install gas

wells in the city, and the mayor entered into a lease agreement with Bass Energy to that effect. Rescission of the mayor's authority to enter into the lease totally destroyed the lease.

C

{¶ 16} But even if we were to find that Resolution No. 8–2008 did not totally destroy the lease, we have no doubt that it acted as a substantial impairment to the lease.

{¶ 17} Some considerations of contract impairment include whether the impaired term was central to the contract, whether settled expectations have been disrupted, and whether the impaired right was reasonably relied on. See *El Paso v. Simmons* (1965), 379 U.S. 497, 514, 85 S.Ct. 577, 13 L.Ed.2d 446. If an industry is heavily regulated, the parties are considered to have less reasonable expectation that legislation will not alter their contractual arrangements. See *Energy Reserves Group, Inc. v. Kansas Power & Light Co.* (1983), 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569. In *Middletown,* the Ohio Supreme Court found two considerations pertinent in determining whether an impairment was "substantial": the extent to which reasonable expectations in the contract were "disrupted" and whether a party has relied on an obligation that is impaired by legislation, as when the legislation impairs the express terms of a contract. Id., 25 Ohio St.3d at 77, 25 OBR 125, 495 N.E.2d 380, citing *Allied Structural Steel Co.,* 438 U.S. at 246–247, 98 S.Ct. 2716, 57 L.Ed.2d 727.

{¶ 18} In its findings of fact and conclusions of law, the court found that Resolution No. 8–2008 substantially impaired the lease because Bass Energy "expected a term of three years for the selection of the well locations." Applying the applicable factors, we must consider whether the lease term was central to the contract, whether the adoption of Resolution No. 8–2008 disrupted Bass Energy's settled expectations, and whether Bass Energy reasonably relied upon the availability of the three-year lease term.

{¶ 19} We have no basis for reversing the court's finding that Resolution No. 8–2008 substantially impaired Bass Energy's contractual rights under the lease. As written, the lease did more than just allow Bass Energy a three-year lease term—it continued "in force for a term of 3 [sic] years and so much longer thereafter as oil and gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the reasonable judgment of [Bass Energy]." In other words, the lease was open-ended until such time as the wells stopped producing. And if a well was not commenced, the lease continued in force, provided that Bass Energy paid an annual delay rental fee.

{¶ 20} The materials submitted by the parties both in support of and in opposition to the motion for a preliminary injunction recited facts showing that Bass Energy had reasonable expectations under the contract. Using site drawings prepared by the city engineer, Bass Energy submitted plans to the Ohio Department of Natural Resources for drilling permits on the site. Those plans contained specific drilling locations on the city property. The plans were approved by the Department of Natural Resources and the permits issued allowed drilling at the same site locations listed on the plans drawn by the city engineer. Bass Energy claimed to have expended more than $27,000 in preparing the site and obtaining the necessary permits for drilling. At no time during the application process did the city give any indication that it would not approve the drilling sites.

{¶ 21} The city also contributed to Bass Energy's reasonable expectations under the contract by accepting two delayed rental payments. Those payments were required if Bass Energy did not commence a well within six months, but desired to continue the lease. The city admittedly accepted two delayed rental payments: one made after the state approved the drilling locations listed on the permit application; the other made after the city had adopted Resolution No. 8–2008. Although the city later tried to return these payments, there is no question that Bass Energy's payment showed that it intended to perform under the contract. By accepting payment after the state of Ohio had approved drilling plans, the city contributed to Bass Energy's expectations that the lease would continue.

{¶ 22} We also agree that although the lease required the city to give written approval of drilling sites, its actions in preparing site plans showing the specific location of wells during the permit process would have given Bass Energy a reasonable expectation that the lease would continue in force from the time that wells were commenced until such time as the wells stopped producing. So even though the lease gave the city the right to withhold its written consent for well locations, the city's actions from the formation of the lease—its assistance in preparing drilling plans for submission to the state and its acceptance of delay rental payments—up to the adoption of Resolution No. 8–2008 gave Bass Energy no indication that the city had any issue with well locations approved by its city engineer.

{¶ 23} Even if the city could unilaterally withhold consent to well locations under the lease, Bass Energy could potentially argue that the lease was illusory because the city would retain the unlimited right to determine the nature and extent of its performance. *Century 21 Am. Landmark, Inc. v. McIntyre* (1980), 68 Ohio App.2d 126, 129–130, 22 O.O.3d 141, 427 N.E.2d 534; Restatement of the Law 2d, Contracts (1981), Section 77, at Comment a (stating that "[w]ords of

promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise" and, instead, constitute an illusory promise). Taken to its logical extreme, the city's argument is that it had the absolute right to refuse any well location during the term of the contract despite accepting delayed rent payments. Doing so could render its obligation of performance illusory, even while forcing Bass Energy to perform under the contract. This question becomes more acute given that the United States Supreme Court has consistently reaffirmed that "impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties." *Spannaus*, 438 U.S. at 244, 98 S.Ct. 2716, 57 L.Ed.2d 727, fn. 15, citing *United States Trust*, 431 U.S. at 22–23, 97 S.Ct. 1505, 52 L.Ed.2d 92. See also *Exxon Corp. v. Eagerton* (1983), 462 U.S. 176, 192, 103 S.Ct. 2296, 76 L.Ed.2d 497, fn. 13 ("The statutes under review in *United States Trust Co.* also implicated the special concerns associated with a State's impairment of its own contractual obligations").

## D

{¶ 24} Finally, the city argues that certain exceptions to the substantial-impairment test exist in cases where the legislative body exercises its power to protect the health and welfare of its citizens.

{¶ 25} The United States Supreme Court has held that the police power, as "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, is paramount to any rights under contracts between individuals." *Spannaus*, 438 U.S. at 241, 98 S.Ct. 2716, 57 L.Ed.2d 727. "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group*, 459 U.S. at 410, 103 S.Ct. 697, 74 L.Ed.2d 569, quoting *Home Bldg. & Loan Assn. v. Blaisdell* (1934), 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413. The accommodation to the police power is not absolute—when a state's action interferes with its own contractual obligations, as opposed to mere private contracts, the United States Supreme Court has made clear that we are to examine the state's conduct with a higher level of scrutiny. *United States Trust Co.*, 431 U.S. at 20–21, 97 S.Ct. 1505, 52 L.Ed.2d 92. Assuming a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." Id. at 22, 97 S.Ct. 1505, 52 L.Ed.2d 92.

{¶ 26} The city argues that it adopted Resolution No. 8–2008 in the exercise of its police powers to protect its citizens and ensure that its public parks are safe.

In a letter to Bass Energy sent after the adoption of Resolution No. 8–2008, the city law director explained that the city rescinded the lease based on "recent reports of gas/oil well explosions in other areas and the proximity of the proposed well-heads to residential neighborhoods." Protection of the public health, safety, and welfare is a legitimate public purpose, but the question remains whether the means used to establish this purpose was valid.

{¶ 27} The city used identical language to characterize the public-safety concerns in both Resolution No. 8–2008 and Resolution No. 63–2006. Each resolution was declared to be "an emergency measure necessary to the immediate preservation of the health, safety and welfare of the residents of Highland Heights." In Resolution No. 63–2006, the city stated the need to commence and complete drilling of the wells "prior to the opening of the park in the Spring," while in Resolution No. 8–2008, the city stated that "the gas wells may be a safety and health concern to the residents."

{¶ 28} Given the identical nature of the language relating to the "immediate preservation of the health, safety and welfare of the residents of Highland Heights," the city's reliance on its police powers as a reason for rescinding the lease is unpersuasive. When the state is a party to the contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." Id. at 26, 97 S.Ct. 1505, 52 L.Ed.2d 92. "When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." *Energy Reserves Group,* 459 U.S. at 413, 103 S.Ct. 697, 74 L.Ed.2d 569, fn. 14. The identical language used in antithetical resolutions to declare the need to preserve the health, safety, and welfare of the city's residents belies the stated intent. The city no doubt felt pressure from its residents to discontinue the well projects, but that pressure did not entitle the city to casually cite its police powers as justification for rescinding the lease when it claimed the exercise of those same police-powers as a justification for ordering the mayor to enter into the same lease. The city's action gives the appearance that it used the police-powers argument as an impermissible excuse to "walk away from its financial obligations" under the lease.

E

{¶ 29} The standard for reviewing preliminary injunctions is that an order granting or denying an injunction may not be reversed "absent a showing of a clear abuse of discretion." *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or

unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 30} The adoption of Resolution No. 8–2008 altered relations between the parties by making it impossible for Bass Energy to perform the contract. The court could rationally have found that the resolution completely destroyed the lease, or otherwise substantially impaired it to the point of being unconstitutional under both Section 28, Article II of the Ohio Constitution and Section 10, Article I of the United States Constitution. We thus conclude that the court did not abuse its discretion by finding Resolution No. 8–2008 to be an unconstitutional impairment of the city's lease with Bass Energy. Resolution No. 8–2008 is void ab initio. *Middletown,* 25 Ohio St.3d at 80, 25 OBR 125, 495 N.E.2d 380.

{¶ 31} In reaching this conclusion, we stress that our discussion of whether the city impaired its lease with Bass Energy by adopting Resolution No. 8–2008 is not to be taken as a decision on the merits of the breach-of-contract claim. Reference to contract law is sometimes unavoidable in Contract Clause cases, but as we explain in Part III of this opinion, issues relating to Bass Energy's breach-of-contract claim are matters to be submitted to arbitration for resolution and must be resolved in the first instance by the arbitrator.

### III

{¶ 32} The city's second assignment of error complains that the court erred by finding that Bass Energy did not waive its right to arbitrate the dispute because it waited too long to demand arbitration. It claims that by filing this action, Bass Energy acted inconsistently with its contractual right of arbitration. It also maintains that Bass Energy waived the right to demand arbitration by waiting nearly one year after being informed of Resolution No. 8–2008, and some five months after initiating suit, to demand arbitration.

### A

{¶ 33} Arbitration is a matter of contract and, like any other contractual provision, can be enforced unless the parties waive that right. A party may explicitly waive its right to arbitration, or may implicitly waive its right by failing to assert it or by participating in litigation to such an extent that its actions are "completely inconsistent with any reliance" on this right, resulting in prejudice to the opposing party. *Gen. Star Natl. Ins. Co. v. Administratia Asigurarilor de Stat* (C.A.6, 2002), 289 F.3d 434, 438; *Gordon v. OM Fin. Life Ins. Co.,* 10th Dist. No. 08AP–480, 2009-Ohio-814, 2009 WL 441977, at ¶ 14. However, the strong public policy favoring arbitration of disputes means that the courts do not lightly infer that a party who has initiated litigation on a matter has waived the right to arbitration. *Harsco Corp. v. Crane Carrier Co.* (1997), 122 Ohio App.3d 406, 413,

701 N.E.2d 1040. The party claiming waiver must show that the party demanding arbitration acted inconsistently with the right to arbitrate. *U.S. Bank, N.A. v. Wilkens,* 8th Dist. No. 93088, 2010-Ohio-262, 2010 WL 323432, at ¶ 29. We review the court's decision to stay proceedings and order arbitration for an abuse of discretion. *Carter Steel & Fabricating Co. v. Danis Bldg. Constr. Co.* (1998), 126 Ohio App.3d 251, 254, 710 N.E.2d 299.

B

{¶ 34} The city adopted Resolution No. 8–2008 on January 22, 2008, and the law director notified Bass Energy of that fact by letter dated January 24, 2008. Bass Energy filed its complaint for breach of contract, declaratory judgment, and preliminary injunction on July 18, 2008, but did not ask the court to stay the proceedings pending arbitration until December 5, 2008. At that point, the parties had completed discovery and fully briefed the issues relating to Bass Energy's motion for a preliminary injunction.

{¶ 35} The facts show that Bass Energy did not immediately demand arbitration, but the court avoided discussing this delay by finding that the city's decision to rescind the lease left Bass Energy with "no option but to file in court." We take this conclusion to mean, consistent with Bass Energy's arguments, that the city's adoption of Resolution No. 8–2008 and subsequent rescission of the lease indicated that the city no longer considered there to be a valid lease between the parties, so that a determination of whether the lease continued in force was a predicate for ordering arbitration.

{¶ 36} In *Buckeye Check Cashing, Inc. v. Cardegna* (2006), 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038, the United States Supreme Court held that a challenge to the validity of the contract as a whole, not specifically to the arbitration clause, must be submitted to the arbitrator in the first instance. This is because an arbitration clause is essentially "a contract within a contract such that an alleged failure of the overall contract does not necessarily invalidate the arbitration clause." *Garber v. Buckeye Chrysler–Jeep–Dodge of Shelby,* 5th Dist. No. 2007–CA–021, 2008-Ohio-3533, 2008 WL 2789074, at ¶ 16, citing *Lou Carbone Plumbing, Inc. v. Domestic Linen Supply & Laundry Co.,* 11th Dist. No. 2002–T–0026, 2002-Ohio-7169, 2002 WL 31862330. So the court had no basis for concluding that Bass Energy could not seek arbitration while at the same time litigating the Contract Clause issue.

{¶ 37} Nevertheless, we find no abuse of discretion in the court's decision to stay proceedings and permit arbitration, because the city has not shown that Bass Energy acted so "inconsistently" with its right to arbitration that it must be deemed to have waived the right or that it suffered prejudice from any delay.

{¶ 38} The courts have held that a party waives its right to arbitration if the party knows of an existing right to arbitration, acts inconsistently with that right, and prejudices the opposing party by the inconsistent acts. See *Ritzel Communications, Inc. v. Mid–American Cellular Tel. Co.* (C.A.8, 1993), 989 F.2d 966, 969. "There are no talismanic formulas for determining the existence of an implicit waiver, and no one factor can be isolated or singled out to achieve controlling weight." *Middletown Innkeepers, Inc. v. Spectrum Interiors*, 12th Dist. No. CA2004–01–020, 2004-Ohio-5649, 2004 WL 2380983, at ¶ 14.

{¶ 39} Bass Energy considered a ruling on the Contract Clause issue to be a necessary predicate for any contract issues under the lease. This raised constitutional issues, and there is precedent for the proposition that an arbitrator has no authority to consider constitutional issues. See *State Office of Collective Bargaining v. Ohio Civ. Serv. Emp. Assn.* (Jan. 4, 1990), 10th Dist. No. 89AP–414, 1990 WL 451; *Hennepin Cty. v. Law Enforcement Labor Servs., Inc.* (Minn. 1995), 527 N.W.2d 821, 824; *Stratford v. Internatl. Assn. of Firefighters, AFL–CIO, Local 998* (1999), 248 Conn. 108, 116, 728 A.2d 1063; *Philadelphia v. FOP Lodge No. 5* (1991), 140 Pa.Cmwlth. 235, 592 A.2d 779. So even though Bass Energy could have immediately sought arbitration of its rights under the lease, its decision to litigate the Contract Clause issue as a predicate to demanding arbitration was not necessarily inconsistent with its arbitration rights.

{¶ 40} We also find that the city offered no reason to conclude that it suffered prejudice from Bass Energy's late demand for arbitration. The Contract Clause impairment issues were always going to be heard in the court of common pleas, no matter if the parties were at the same time arbitrating nonconstitutional lease issues. It seems unlikely that an arbitrator would have proceeded to hear substantive lease issues knowing that a court had a pending motion for a preliminary injunction before it. And discovery from the court of common pleas proceedings was almost certainly going to be used by the parties in arbitration, so it is equally unlikely that the arbitration process would have made any progress until the constitutional issues were resolved. Tellingly, the city makes no argument that it was prejudiced by Bass Energy's delay in demanding arbitration, nor does it suggest that the course of litigation would have been in any way different had Bass Energy made a more timely demand for arbitration.

{¶ 41} In the end, the city has done nothing more than argue a waiver based on a technical failure to make an immediate demand for arbitration. It has failed to show that Bass Energy acted inconsistently with its right of arbitration, nor has it shown any form of prejudice resulting from the delay. We earlier acknowledged that arbitration is the preferred way to settle disputes and that waiver of the right to arbitration should not be lightly inferred. Given the deferential nature of our review, we cannot say, under the unique circumstances presented

here, that the court abused its discretion by staying the proceedings and ordering the parties to submit to arbitration.

## IV

{¶ 42} Finally, we address Bass Energy's cross-assignment of error that claims that the court erred by interpreting terms of the lease other than those necessary and by making factual findings to the effect that did not authorize in writing the location of well heads.

{¶ 43} We agree with Bass Energy's argument that the court's decision to stay the proceedings pending arbitration left the court without authority to make any factual findings on issues that were arbitrable under the lease. The arbitrator is the final judge of both law and facts on issues encompassed by the agreement to arbitrate. *Goodyear Tire & Rubber Co. v. Local Union No. 200, United Rubber, Cork, Linoleum & Plastic Workers of Am.* (1975), 42 Ohio St.2d 516, 522, 71 O.O.2d 509, 330 N.E.2d 703. That authority extends to the point where an arbitrator's factual findings are virtually unreviewable by a court. See R.C. 2711.10; *Motor Wheel Corp. v. Goodyear Tire & Rubber Co.* (1994), 98 Ohio App.3d 45, 51–52, 647 N.E.2d 844 ("a common pleas court is bound by an arbitrator's factual findings and serves only as a mechanism to enforce the arbitrator's award").

{¶ 44} We earlier noted that some discussion of the underlying facts was unavoidable in reaching the merits of the Contract Clause violation, but cautioned that nothing we said should be construed as a finding on the merits of any claims that are arbitrable. The same applies to the extent that any part of the court's opinion can be construed as having made factual findings that are within the province of an arbitrator.

Judgment affirmed.

GALLAGHER, A.J., concurs.

DYKE, J., concurs in judgment only.